2005-NMCA-006

104 P.3d 1092

Dora M. ATLER, individually, and as the natural mother, guardian, and next friend of Vanessa Atler, a minor, Plaintiff–Appellee,

v.

MURPHY ENTERPRISES, INC., a Nebraska corporation, and Spectacular Attractions, Inc., an Oklahoma corporation, Defendants–Appellants.

No. 23,620.

Court of Appeals of New Mexico.

Nov. 18, 2004.

Certiorari Granted, No. 28,982, Jan. 10, 2005.

Bill Chappell, Jr., Michael Hoeferkamp, Chappell Law Firm, P.A., Albuquerque, NM, Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, NM, for Appellees.

Thomas C. Bird, Anastasia S. Stevens, Gary J. Van Luchene, Benjamin F. Feuchter, Keleher & McLeod, P.A., Daniel J. O'Brien, Richard J. Valle, O'Brien & Houliston, Albuquerque, NM, for Appellants.

## OPINION

WECHSLER, Chief Judge.

{1} Defendants, Murphy Enterprises, Inc. (Murphy), and Spectacular Attractions, Inc.

(Spectacular), the sole shareholder of Murphy, appeal from a jury verdict awarding compensatory and punitive damages to Plaintiff. Defendants acknowledged their own negligence, but argued at trial that others were comparatively negligent. They also argued that punitive damages were not justified. Following a verdict finding Defendants 66% liable for Plaintiff's actual damages and awarding punitive damages, Defendants attack the punitive damage award, jury instructions, and evidentiary and legal rulings. Because we are not persuaded that any error in this case justifies reversing the jury verdict, we affirm.

*Background*

{2} On September 26, 1998, Vanessa Atler was injured on the Cliff Hanger ride at the New Mexico State Fair when the car in which she was riding flew off and crashed to the ground because of a missing bolt. The Cliff Hanger was owned by Butler Amusements, Inc. (Butler), but Butler had leased the ride to Defendants to use during the 1998 State Fair and agreed to provide "qualified experienced personnel required to operate and maintain the ride." Joel Roy, who had been working for Butler since July 1998, traveled to New Mexico to operate the Cliff Hanger at the State Fair in September 1998. Roy was accompanied by Julie Worley, and there was evidence at trial that Defendants told Roy the location and hours for the ride, that Roy and Worley were paid by Defendants, and that Roy was in charge of other employees of Defendants who worked on the ride, although Defendants denied that Roy was their employee. In their contract with the State Fair, Defendants agreed to keep the rides in safe operating condition, to hire personnel to operate and maintain the equipment, and to provide a sufficient number of personnel to do so. In addition, the contract required Defendants to comply with the Carnival Ride Insurance Act, NMSA 1978, §§ 57–25–1 to 57–25–6 (1993, as amended through 1996). Section 57–25–3(E) specifically requires that the "owner or operator of the ride shall inspect the ride each day the ride is operated."

{3} In her second amended complaint, Plaintiff named as defendants the State of New Mexico; the New Mexico State Fair; the New Mexico State Fair Commission; Murphy; Dartron Industries, Inc. (Dartron) (the manufacturer of the ride); Butler; Don Becker, Inc. (a safety inspector); Donald W. Becker; Safety Counselling, Inc. (SCI) (a safety inspector); W. Brock Carter (president of SCI); and Spectacular. Plaintiff settled with Butler, Dartron, SCI, Carter, Don Becker, Inc., and Donald Becker. Plaintiff also dismissed her claims against the State of New Mexico and the State Fair. Thus, only Murphy and Spectacular remained as defendants at trial. Defendants admitted they had acted negligently but denied that their negligence was the proximate cause of Vanessa Atler's injuries and denied that their conduct was reckless or wanton.

{4} The jury awarded $371,330.11 in compensatory damages to Vanessa Atler and $28,160 for Dora Atler. The jury found Defendants to be liable to 66% of Plaintiff's compensatory damages. The jury then awarded punitive damages in the amount of $998,725. The court denied various post-trial motions, and Defendants appealed, raising five issues in their brief in chief: whether the trial court erred (1) in improperly instructing the jury on the standard for punitive damages; (2) in not rejecting, as a matter of law, claims for punitive damages based on the conduct of Roy or managerial employees of Murphy; (3) in failing to offset the damage award by the amount of Plaintiff's settlement with the other defendants who settled before trial; (4) by refusing to include SCI on the special verdict form allocating fault among all defendants; and (5) by instructing the jury not to consider remedial measures in determining Dartron's negligence.

*The Jury Instruction on Punitive Damages*

{5} Defendants argue that the trial court erred in instructing the jury on the standard for punitive damages because Instruction 9, based on UJI 13–302B NMRA, was inconsistent with Instruction 31, based on UJI 13–1827 NMRA. Both instructions described two bases for awarding punitive damages. Instruction 9, the instruction that provided the

jury with an overview of the case, informed the jury that this case was a civil action in which Plaintiff sought damages for injuries that she claimed were the result of Defendants' negligent or reckless/wanton conduct. Instruction 9 informed the jury that it could find Defendants had acted recklessly or wantonly if Plaintiff established either (1) that Roy had acted recklessly or wantonly and "Roy was left or placed in a managerial or supervisory capacity as an employee of Murphy Enterprises at the 1998 New Mexico State Fair," or (2) that Defendants "demonstrated corporate indifference or a cavalier attitude in the face of serious risks of danger, considering the cumulative conduct of its officers and employees individually or as a whole, (including Joel Roy if you find he was an employee of Murphy)." Similarly, Instruction 31, the standard punitive damages instruction, provided that punitive damages could be awarded against Defendants if (1) the jury found Defendants' own conduct was reckless or wanton, or (2) the jury found Roy had acted recklessly "in the scope of his employment by Murphy Enterprises, Inc. and Spectacular Attractions, Inc. and had sufficient discretionary or policy-making authority to speak and act for them with regard to the conduct at issue, independently of higher authority."

{6} As Defendants state, "[w]e review jury instructions de novo 'to determine whether they correctly state the law and are supported by the evidence introduced at trial.'" *Chamberland v. Roswell Osteopathic Clinic, Inc.*, 2001–NMCA–045, ¶ 11, 130 N.M. 532, 27 P.3d 1019 (quoting *Gonzales v. N.M. Dep't of Health*, 2000–NMSC–029, ¶ 28, 129 N.M. 586, 11 P.3d 550). However, Plaintiff argues that the issue of whether the two instructions were inconsistent was not properly preserved below. Our review of the transcript confirms that at the conference settling the jury instructions, the issue of inconsistency was not clearly before the trial court. "To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987).

{7} The two instructions were discussed separately. Instruction 31, the punitive damages instruction, was addressed first, and Defendants objected to the section of the instruction that explained that Defendants could be liable for punitive damages based on Roy's conduct. Specifically, Defendants objected that Plaintiff's requested instruction assumed Roy was an employee of Murphy. The court then adopted Defendants' version of the instruction, which required the jury to find that Roy was acting in the scope of his duties and had sufficient policy-making authority to speak or act for Defendants. The court also deleted the words "malicious" and "willful" from the instruction at Plaintiff's request.

{8} The court proceeded to discuss Instruction 9, the instruction that gave the jury an overview of the case. Defendants first argued that Plaintiff's requested instruction had too much detail and repeated the specific punitive damages instruction set out in Instruction 31. Next, Defendants argued that in order to find them liable for punitive damages based on Roy's conduct, Plaintiff's instruction needed to state that the jury had to find Roy was an employee of Murphy, and the discussion focused on how to clarify the instruction. Defendants agreed to modify the instruction to state that Plaintiff had to prove that Roy was an employee with managerial capacity in order to find Defendants liable for his conduct.

{9} The parties then discussed the standard for punitive damages based on Defendants' own corporate misconduct, which did not necessarily include the reckless or wanton conduct of Roy. The parties and the court discussed the different definitions for reckless and wanton conduct, and Defendants appear to have objected to the contents of the third paragraph of Plaintiff's requested instruction. The Court removed the part of those paragraphs stating that Murphy willfully failed to comply with its safety obligations. The precise nature of Defendants' objection is not clear from the record, but it does not appear to have focused on inconsistency between Instruction 9 and Instruction 31. Indeed, although defense counsel stated that he objected to "that," without further

clarification, he then stated, "But other than that, it seems to be consistent with the first one" anyway.

{10} In their reply brief, Defendants respond to Plaintiff's lack of preservation arguments, arguing generally that Defendants indicated a conflict between the two instructions. As we have noted, although there was some discussion about the standard for punitive damages, and there was some discussion about which elements Plaintiff had to prove, there was no specific discussion about whether Instruction 9 and Instruction 31 provided inconsistent standards for punitive damages.

{11} As this Court has stated in *Gillingham v. Reliable Chevrolet*, 1998–NMCA–143, ¶¶ 16–18, 126 N.M. 30, 966 P.2d 197, Rule 1–051(I) NMRA requires that to preserve an error in jury instructions, "objection must be made to any instruction given, whether in UJI Civil or not; or, in case of a failure to instruct on any point of law, a correct instruction must be tendered, before retirement of the jury." Moreover, the objection cannot be made in general terms. It is necessary to inform the trial court of the specific error so it may have the opportunity to correct the error. *Echols v. N.C. Ribble Co.*, 85 N.M. 240, 246, 511 P.2d 566, 572 (Ct.App.1973). The trial court in this case was not sufficiently advised of the specific error Defendants raise on appeal; thus, we do not reach the issue of whether any inconsistency resulted in reversible error.

*Punitive Damages*

{12} Defendants next argue that the trial court erred, as a matter of law, by not rejecting claims for punitive damages based on the conduct of Roy or managerial employees of Murphy. Defendants make three arguments in support of this issue. First, Defendants contend that there was insufficient evidence to find them vicariously liable for punitive damages based on Roy's conduct because he did not have sufficient discretionary or policy-making authority to speak and act for Murphy. Second, Defendants state there was insufficient evidence to find liability on the basis of the conduct of Murphy's manage-rial employees. Third, Defendants argue that the award violated due process.

*Substantial Evidence to Support an Award of Punitive Damages*

{13} In reviewing a substantial evidence claim, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "Additionally we will not reweigh the evidence nor substitute our judgment for that of the fact finder." *Id.* "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Smith*, 104 N.M. 729, 730, 726 P.2d 883, 884 (Ct.App. 1986).

{14} As we have already stated, the court instructed the jury on two grounds for awarding punitive damages. It was instructed that it could award punitive damages if it found "that the conduct of Murphy Enterprises, Inc. and Spectacular Attractions, Inc. was reckless or wanton." It also instructed that the jury could award punitive damages based on Roy's conduct if it found that Roy was "acting in the scope of his employment" with Defendants and "had sufficient discretionary or policy-making authority to speak and act for them with regard to the conduct at issue, independently of higher authority" or if Defendants "in some way authorized, participated in or ratified the conduct" of Roy.

{15} The court correctly instructed the jury that "[a] corporation can act only through its officers and employees. Any act or omission of an officer or an employee of a corporation, within the scope or course of his or her employment, is the act or omission of the corporation." Reckless conduct was correctly defined as "the intentional doing of an act with utter indifference to the consequences," and wanton conduct was correctly defined as "the doing of an act with utter indifference to or conscious disregard for a person's safety."

{16} When the jury instructions provide two alternative bases for awarding punitive damages, we will uphold the jury verdict if there is substantial evidence in the record to support either. Because there was sufficient evidence to support an award of punitive damages based on Defendants' conduct separate from any acts or omissions of Roy, we do not address the alternative basis. As Plaintiff points out, in determining whether Defendants had the requisite culpable mental state to support an award of punitive damages, this Court views "the actions of the employees in the aggregate." *Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 270, 881 P.2d 11, 15 (1994).

{17} The jury had before it the following evidence of Defendants' reckless or wanton conduct. Under their contract with the State Fair, Defendants were granted the exclusive right to operate the midway in 1998, when this accident occurred. Under that contract, Defendants agreed to inspect all rides operating at the Fair on a daily basis. Defendants also agreed to keep their

> Attractions and Support Equipment in a good and safe state of repair and upkeep, use every known practicable safety device for the protection and safety of passengers and the public, and not bring onto the New Mexico State Fairgrounds, or operate thereon, any Attraction or Support Equipment which may be deemed by the Fair to be unsafe, inappropriate, illegal, or otherwise objectionable.

It appears that Defendants did not view the Cliff Hanger as falling within this requirement because it was owned by Butler. However, Butler had leased the Cliff Hanger to Defendants, and Defendants paid all expenses associated with the ride and retained all the proceeds. Butch Butler, the owner of the Cliff Hanger, who had leased the ride to Defendants, testified that once the ride reached the State Fair, Defendants "had full control of it, whatever they did, where it sat, what time they were going to open up, what time they closed, the employees, [they] had full control."

{18} While there was evidence that Defendants conducted daily inspections of rides they considered their own, there was evidence that they never inspected the Cliff Hanger or any other independent ride. Richard Dueberry, one of Defendants' ride superintendents, testified that Defendants bore no responsibility for the independent rides. Dueberry admitted that Defendants did not instruct the operators of independent rides on inspection procedures. In fact, Dueberry testified that he assumed it was not his job to perform spot safety checks on independently owned rides, and he instructed his employees that they were not responsible for the independent rides. The ride superintendent also testified that he never inspected the Cliff Hanger, that he did not know how much training the operator had, and that Defendants had not told him that he had a responsibility to completely inspect the Cliff Hanger.

{19} One of Defendants' ride supervisors testified that he had "absolutely nothing to do with the independent rides" and did not "have to do a damn thing" to ensure that the independent ride operators were complying with the State Fair rules. The supervisor testified that Defendants' employees had "absolutely nothing to do with the independent rides from other shows or their operation or their set-up or their ride operators or their tear-down, period," and Gerald Murphy, Sr.'s son, Jerry, admitted that Defendants did nothing to train any operators of independent rides at the fair or to check the equipment, that Defendants had no system in place to inspect independent rides, and that it was possible that Defendants' employees never inspected the Cliff Hanger during the 1998 State Fair.

{20} There was also evidence that Defendants failed to provide a sufficient number of qualified personnel to maintain and operate the Cliff Hanger, especially considering its long hours of operation, and that some workers who were sent to help smelled of alcohol and had difficulty walking. Roy testified that Defendants did not seem to have much interest in the way he operated the Cliff Hanger. One of Defendants' employees hired to assist Roy in operating the Cliff

Hanger testified that he was frequently the only one working on the ride, as Roy and Worley were frequently asleep under the ride, and that he never saw anyone other than Roy conduct a safety inspection of the ride. Thus, there was evidence that Defendants did not properly oversee the Cliff Hanger's operation.

{21} Gerald Murphy, Sr. testified that Defendants' personnel did not verify the qualifications of operators sent by Butler, but took it for granted that Butler would send qualified people. He also acknowledged that he mostly stayed in his office while at the fair so that no one would see him. His testimony indicated that he did not respect the general manager of the State Fair, and this attitude was reflected in the testimony of one of his ride supervisors, who complained that the general manager "rode around in her golf cart, and made sure everyone obeyed the rules, as far as dress and uniform, da-da, da-da, da-da."

■ {22} Thus, our review of the record leads us to the conclusion that there was substantial evidence from which the jury could conclude that Defendants demonstrated an utter indifference to the consequences or a conscious disregard for public safety when they failed to conduct the required inspections and abdicated their responsibility to operate the Cliff Hanger in a safe manner. As a result, there was evidence to support a finding that Defendants' conduct was reckless or wanton, justifying an award of punitive damages.

*Reasonableness of Punitive Damage Award*

■ {23} Defendants argue briefly that the punitive damages awarded against them are unreasonable in relation to the reprehensibility of their conduct. Defendants correctly point out that we review the reasonableness of a punitive damage award de novo. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002–NMSC–021, ¶ 17, 132 N.M. 401, 49 P.3d 662. "Any doubt in the mind of the appellate court concerning the question of what appropriate damages may be in the abstract, or owing to the coldness of the record, should be resolved in favor of the jury verdict." *Id.* ¶ 19. In undertaking a de novo review, we consider three criteria:

> 1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* ¶ 20 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). Defendants' argument focuses only on the first factor, citing *Aken* for the principle that the reprehensibility of the conduct is, perhaps, the most important guidepost in the analysis. *See Aken*, 2002–NMSC–021, ¶ 21, 132 N.M. 401, 49 P.3d 662. In analyzing the reprehensibility of a defendant's conduct, our Supreme Court discussed the relevance of whether the defendant had notice of the wrongfulness of his conduct to the constitutionality of a large punitive damage award. *Id.*

■ {24} In this case, Defendants failed to comply with the terms of their contract with the New Mexico State Fair and with the Carnival Ride Insurance Act, Sections 57–25–2(E) and 57–25–3(E), which required Defendants to conduct daily inspections of the rides. Because the purpose of such inspections is to prevent the type of harm that occurred in this case, and because the responsibility to conduct such inspections was set forth in the contract and statute, Defendants cannot claim to be surprised by a large award of punitive damages, especially when the result of such a failure was so tragically predictable. In addition, as Plaintiff points out, the punitive damage award was only 3.79 times Defendants' portion of the award of compensatory damages. As the United States Supreme Court stated in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 424–25, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), it has been reluctant to

set "concrete constitutional limits" on the ratio between compensatory and punitive damages. However, the Court wrote that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425, 123 S.Ct. 1513. In this case, the award was within the constitutional parameter indicated by the Supreme Court. We conclude that Defendants' conduct was sufficiently reprehensible to justify the award of punitive damages and was not excessive.

*Plaintiff's Settlement with Other Defendants*

{25} Defendants argue that Plaintiff's jury award should have been offset by the amount Plaintiff received in settlement with the other defendants who were originally in the case. Defendants argued below, and now on appeal, that under NMSA 1978, § 41–3–4 (1947),

> A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

Both parties agree that under *Hinger v. Parker & Parsley Petroleum Co.*, 120 N.M. 430, 447–48, 902 P.2d 1033, 1050–51 (Ct.App. 1995), a credit for amounts paid by other defendants is improper if the verdict is based on principles of comparative fault. Thus, Defendants' argument presumes that the verdict was based on principles of joint and several liability and not comparative fault.

[15] {26} Defendants premise their argument that they are entitled to offset the amount of Plaintiff's settlement with the other defendants from the jury verdict on the assertion that Plaintiff argued at trial that Defendants had a non-delegable duty to insure Vanessa Atler's safety and were therefore liable for any and all damages suffered.

Plaintiff's argument to the jury, however, that the non-settling Defendants were 100% at fault, is not sufficient to support Defendants' argument that the case was tried and the jury instructed on a theory of joint and several liability. As Plaintiff argues in her answer brief, all Plaintiff's claims for joint and several liability were dismissed before trial, and the case was tried on the basis of comparative fault, an argument supported by the record, which shows that the special verdict forms requested by both parties instructed the jury to apportion damages based on principles of comparative fault.

[16] {27} Defendants argue in their brief in chief that Instruction 24, which instructed the jury not to consider evidence that had been introduced of Plaintiff's settlement with other defendants in determining a damages award against Defendants, was almost identical to the uniform instruction to be used in cases of when a joint tortfeasor has been released. As Plaintiff points out, however, Defendants never made this argument below and thus have not preserved this issue for appeal. *See Woolwine*, 106 N.M. at 496, 745 P.2d at 721. We also note that, in their reply brief, Defendants have not replied to Plaintiff's arguments that this issue was not preserved.

[17] {28} Because we do not find support in the record for Defendants' contention that this case was presented to the jury on a theory of joint and several liability, this case is controlled by *Hinger*, which holds that there is no right to reduction of a jury award based on out-of-court settlements when the case is tried on a theory of comparative fault. *Hinger*, 120 N.M. at 447–48, 902 P.2d at 1050–51 (citing NMSA 1978, § 41–3A–1(E) (1987), and *Wilson v. Galt*, 100 N.M. 227, 232, 668 P.2d 1104, 1109 (Ct.App.1983)). Accordingly, we affirm the district court's ruling that Defendants were not entitled to offset from the jury verdict the amount of Plaintiff's settlement with the other defendants.

*The Special Verdict Form*

[18, 19] {29} Defendants argue that the trial court erred by refusing to list Defen-

dant SCI on the special verdict form as one of the defendants to whom the jury could allocate fault. It is well settled that if a legal theory is supported by the evidence, a party is entitled to have the jury instructed on that theory. *Thompson Drilling, Inc. v. Romig,* 105 N.M. 701, 705, 736 P.2d 979, 983 (1987). As this Court has previously stated, we review the trial court's refusal to include a non-party on a verdict form to determine whether there was sufficient evidence to state a claim for the non-party's negligence. *See Jaramillo v. Kellogg,* 1998–NMCA–142, ¶ 5, 126 N.M. 84, 966 P.2d 792. However, whether sufficient evidence exists to support a claim or defense is a question of law. *In re Estate of Kimble,* 117 N.M. 258, 260, 871 P.2d 22, 24 (Ct.App.1994); *see also State v. Apodaca,* 118 N.M. 762, 766, 887 P.2d 756, 760 (1994) (stating that a sufficiency of the evidence review involves a two-step process: viewing the evidence in the light most favorable to the verdict, then making a legal determination of "whether the evidence viewed in this manner could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt") (internal quotation marks and citation omitted).

{30} To prove SCI's negligence, Defendants would have had to show that SCI had a duty recognized by law, that SCI breached its duty, and that the breach proximately caused Vanessa Atler's injuries. *See Jaramillo,* 1998–NMCA–142, ¶ 7, 126 N.M. 84, 966 P.2d 792. In this case, the trial court refused to include SCI on the special verdict form because there were "causation and proximate causation and independent intervening cause problems with Safety Counseling and having any liability in this case."

{31} Defendants argue that apportionment of fault is a factual question for the jury to consider, and rely on *Yardman v. San Juan Downs, Inc.,* 120 N.M. 751, 756, 906 P.2d 742, 747 (Ct.App.1995), to argue that sufficient evidence of SCI's negligence existed to send the issue to the jury. Defendants argue that evidence of SCI's negligence in two areas was presented at trial: that Plaintiff's ex-

perts testified that SCI's inspection of the Cliff Hanger was inadequate, and that SCI was negligent in not recommending the installation of a safety cable to backup the single point suspension, which would have prevented the accident. Defendants point out that another of Plaintiff's experts testified that the inspection should have been conducted by safety design engineers and that SCI's employees were not qualified and conducted the inspections negligently. Defendants argue there was also evidence that SCI only conducted a visual inspection of the bolts instead of using a torque wrench or other tool.

{32} In response, Plaintiff argues that this case can be distinguished from *Yardman,* in which a jockey who was injured when the horse he was riding threw him against a post and track railing sued the race track. *Yardman,* 120 N.M. at 755, 906 P.2d at 746. In *Yardman,* there was evidence that the jockey, who had participated in more than seventy-five races at the track, was negligent in riding at the track because he was aware of the dangerousness of the track conditions. *Id.* at 755–57, 906 P.2d at 746–48. Thus, this Court determined that the jury should have received the requested comparative negligence instruction.

{33} Plaintiff contends that the district court correctly refused to include SCI on the special verdict form in this case because there was no evidence that SCI knew the bolt was loose or missing at the time of its inspection or that SCI's failure to point out the lack of a safety cable caused the accident. She points out that the last day on which SCI conducted inspections at the State Fair was September 15, 1998 when Don Becker, who was on the special verdict form, took over inspections. The accident in this case did not occur until eleven days later, on September 26, 1998. Plaintiff argues that Defendants concede that there is no evidence of when the bolt became loose and fell out, and thus it cannot be demonstrated that SCI was negligent in not finding the loose or missing bolt. In addition, Plaintiff argues that Don Becker informed Defendants that the Cliff Hanger

had no safety cable and that Defendants did not act on the information. Thus, Plaintiff ·asserts that SCI's failure to warn Defendants was not the proximate cause of the accident.

■ {34} We agree with Defendants that issues of negligence and proximate cause are generally questions of fact. *Herrera v. Quality Pontiac,* 2003–NMSC–018, ¶¶ 6, 8, 134 N.M. 43, 73 P.3d 181. However, as we stated earlier, the question of whether sufficient evidence exists to state a claim for negligence is one of law. *In re Estate of Kimble,* 117 N.M. at 260, 871 P.2d at 24. We first address whether there was evidence that SCI's failure to recommend the installation of a safety cable constituted negligence that proximately caused Vanessa Atler's injuries. Under the facts of this case, Defendants' argument is unpersuasive. Viewing the facts in a light most favorable to upholding the jury verdict, we are compelled to agree with Plaintiff that because Don Becker, who conducted inspections after SCI had completed its inspections, informed a Murphy employee of the absence of a backup safety strap, any negligence on SCI's part was cured by Becker's action and thus was not the proximate cause of Vanessa Atler's injuries.

{35} In addition, we are not persuaded that Defendants met their burden of showing that SCI was negligent in failing to detect the loose bolt or that any negligence proximately caused Vanessa Atler's injuries. As Plaintiff points out, Defendants did not demonstrate that the bolt was loose at the time that SCI was conducting inspections. Nor do we believe that the testimony of Robert Coil, the owner of Dartron, supports Defendants' argument. Coil testified that it was "impossible" to determine how long it took for the bolt to work its way out of the ride and speculated that "an opinion might be that it took several days to work its way out." Viewing this testimony in a light most favorable to upholding the jury verdict, we agree with Plaintiff that this testimony is too speculative to support a claim that any negligence on SCI's part was a proximate cause of Vanessa Atler's injuries.

{36} Accordingly, we affirm the trial court's ruling that there was insufficient evidence of comparative negligence to include SCI on the special verdict form.

## Evidence of Subsequent Remedial Measures

{37} During trial, Defendants sought to introduce evidence that after the accident, the manufacturer of the Cliff Hanger, Dartron, had made changes to the safety manual that instructed operators about conducting a safety check and had modified the ride itself by installing a backup safety strap. Defendants sought to introduce this evidence to demonstrate that some of the fault for Vanessa Atler's injuries should be attributed to Dartron. The parties acknowledge that some evidence of Dartron's subsequent remedial measures was initially admitted into evidence. Subsequently, however, the court reconsidered its ruling and then instructed the jury not to consider subsequent remedial measures as evidence of negligence.

■ {38} The admission or exclusion of evidence is reviewed for abuse of discretion. *Coates v. Wal–Mart Stores, Inc.,* 1999–NMSC–013, ¶ 36, 127 N.M. 47, 976 P.2d 999. A trial court abuses its discretion when it applies an incorrect standard. *N.M. Right to Choose/NARAL v. Johnson,* 1999–NMSC–028, ¶ 7, 127 N.M. 654, 986 P.2d 450. Under Rule 11–407 NMRA, evidence of measures taken after an event "which, if taken previously, would have made the event less likely to occur, . . . is not admissible to prove negligence." However, in *Couch v. Astec Industries, Inc.,* 2002–NMCA–084, ¶ 26, 132 N.M. 631, 53 P.3d 398, we stated that the prohibition against evidence of subsequent remedial measures set out in Rule 11–407 does not apply to measures taken by non-defendants, such as Dartron.

{39} Plaintiff does not argue that the court was correct in excluding the evidence. She simply argues that Defendants have not demonstrated that they were prejudiced by the exclusion of evidence of subsequent remedial measures made by Dartron. Plaintiff argues that because evidence of the measures was

introduced earlier in trial, the excluded evidence was cumulative, and Defendants have not shown that they were prejudiced by the exclusion. She notes that in closing arguments both she and Defendants agreed that Defendants were negligent, and the jury attributed 30% of the fault to Dartron. Thus, Plaintiff argues that any error does not justify reversal. Defendants argue that the court's instruction to the jury not to consider evidence of remedial measures, in effect, eradicated any evidence that had been admitted earlier and that they were prejudiced by this complete exclusion. They contend that the exclusion of evidence of remedial measures by Dartron was highly prejudicial because "[i]t provided extremely persuasive corroboration to the opinions of the experts that there was a design defect, and that the accident would not have occurred if it had been designed in accordance with the subsequent repair." They state that evidence of subsequent remedial measures would have demonstrated how easily Dartron could have improved the safety of the Cliff Hanger. Failing to include this evidence, Defendants argue, "undermined the jury's negligence calculus and apportionment of fault."

{40} As our Supreme Court wrote in *Kennedy v. Dexter Consolidated Schools*, 2000–NMSC–025, ¶ 26, 129 N.M. 436, 10 P.3d 115 (internal quotation marks and citation omitted), "[i]n civil litigation, error is not grounds for setting aside a verdict unless it is inconsistent with substantial justice or affects the substantial rights of the parties." Under this standard, we are not persuaded that Defendants were prejudiced by the exclusion of evidence of subsequent remedial measures. Although the jury was instructed not to consider evidence of remedial measures, it heard evidence to support a finding that Dartron was negligent. Gary Thompson, Plaintiff's expert engineer, testified that the Cliff Hanger was "unsafe to operate as it was built and assembled and allowed to operate at the state fair[.]" Thompson testified that there were problems with the way the bolt was designed and secured. He also testified that he would have set up an inspection require-

ment and that a backup safety strap would have prevented the car from falling. Robert Coil testified that the Cliff Hanger did not contain a backup safety strap that was used on another Dartron ride, the Star Trooper. Joel Roy testified that Coil told him that Dartron would take full responsibility for the accident, that the ride had been badly designed, and that Roy had not been required to inspect the bolt that had fallen out of the ride. Bradford Mosher, state ride inspector for Florida, testified that had he been inspecting the Cliff Hanger, he would have asked the operator and his supervisor if it should have had a safety cable because in his opinion all rides like the Cliff Hanger, which have single-point suspension, should have that type of backup safety device.

{41} In closing argument, Defendants argued to the jury that they should find Dartron 50% negligent for Vanessa Atler's injuries. They emphasized that Coil told Roy that the accident was Dartron's fault. They stressed that Thompson testified that the ride had been badly designed and should have had a safety strap. Although Defendants were not permitted to refer to any changes Dartron made to the Cliff Hanger after the accident, they were permitted to argue in closing that the manual that Roy used to inspect the ride did not require him to look at the bolt that fell out. Defendants argued at length that Dartron used the manual to train Butler, who then gave the manual to Roy. They also told the jury, without objection, that there were two manuals, "the manual that was made afterwards and the manual before," and that the jury would see that the earlier version included "no provision for inspecting this bolt." Defendants also pointed out that installation of a backup safety strap was not new technology, but had been used on an earlier ride manufactured by Dartron. Having asked the jury to attribute 50% of the fault to Dartron, Defendants asked them to attribute 25% of the fault to Don Becker, the inspector for the State Fair, and 25% to Defendants and Butler, attributing 15% and 10% to those parties, depending on whom the jury believed employed Roy.

{42} In light of all this evidence presented of Dartron's fault, we cannot say that Defendants were prejudiced because the trial court instructed the jury not to consider evidence that Dartron had subsequently added a safety cable and rewritten their manual. We therefore hold that Defendants were not prejudiced by the trial court's instruction to the jury that it should not consider subsequent remedial measures in determining negligence.

## Conclusion

{43} We hold that the trial court did not err in instructing the jury on the standard for punitive damages and that the award of punitive damages was supported by substantial evidence and did not violate due process. We also hold that the trial court correctly determined Defendants were not entitled to offset Plaintiff's settlement from the jury award and did not err in omitting SCI from the special verdict form. Finally, we hold that Defendants were not prejudiced when the trial court instructed the jury not to consider evidence of subsequent remedial measures in determining Dartron's comparative fault. Accordingly, we affirm.

{44} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE and CELIA FOY CASTILLO, Judges.