This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**LAUREL L. DeANDA, individually and**
**in her capacity as the Personal Representative**
**of the Estate of KEVIN PHILLIP DeANDA,**
**VICTOR DeANDA, individually, and**
**LYNELLE STURGEON, individually,**

     Plaintiffs-Appellees,

v.                 **No. 32,148**

**NEW PATHWAYS, INC.,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nan G. Nash, District Judge**

Yenson, Allen & Wosick, P.C.
Patrick D. Allen
Michael S. Jahner
Albuquerque, NM

for Appellees

Brennan & Sullivan, P.A.
Michael W. Brennan
Joan M. Waters
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**FRY, Judge.**

{1}     Kevin DeAnda died in his sleep while a resident of Defendant New Pathways, Inc.'s (NPI) supported living facility, Chelwood House.  Kevin was twenty-five years old at the time of his death and suffered from asthma, GERD, enlarged tonsils, and was morbidly obese.  Kevin also had a history of mental health issues and developmental disabilities, including Asperger syndrome, psychosis, anxiety disorder, and major depression.  Months before his death, Kevin was diagnosed with severe obstructive sleep apnea.

{2}     On the night of his death, Kevin was last checked by NPI staff at 4:00 a.m.  Kevin was asleep on his stomach, and an NPI staff member asked Kevin to roll over onto his back.  It is undisputed that no further checks were made on Kevin until 6:50 a.m., at which time another employee of NPI entered Kevin's room to administer medication and found Kevin unresponsive.

{3}     Based upon alleged acts and omissions of NPI staff, Kevin's family subsequently filed suit against NPI for wrongful death, negligence, negligence per se, violation of the Unfair Practices Act (UPA), and loss of consortium.  The jury found in favor of the DeAnda family.  We affirm the judgment of the district court.

**{4}**     Because this is a memorandum opinion and because the parties are familiar with the procedural history and facts of the case, we reserve further discussion of pertinent facts for our analysis.

**DISCUSSION**

**Dr. Kevin Olden's Testimony**

**{5}**     NPI contends that the district court erred in admitting the testimony of Plaintiffs' expert, Dr. Olden, because Dr. Olden was not qualified to testify regarding Kevin's cause of death or the appropriate treatment for sleep apnea. NPI further argues that even if Dr. Olden was qualified, his testimony was too speculative and conjectural as a matter of law to establish causation. At trial, Plaintiffs proffered Dr. Olden to testify from an "internal medicine clinical perspective" that Kevin's death was due to sleep apnea, that NPI's failure to monitor Kevin resulted in the fatal apneic episode, and that there was no evidence of heart failure. Dr. Olden was ultimately recognized as an expert in internal medicine and psychiatry.

**{6}**     NPI did not object to Dr. Olden's qualifications or testimony until trial. The district court asked NPI why, despite the district court's pretrial scheduling order mandating that objections to expert qualifications and testimony be made within three weeks of the expert's deposition, NPI waited until trial to make its objection. NPI's counsel responded that "other judges had me doing things for them, deadlines I had

3

to meet, and I was preparing for a month-long trial in federal court. . . . But those are deadlines, unfortunately, professionally I had to meet, and admittedly, I missed your deadline." The district court accordingly denied NPI's objection to Dr. Olden's qualifications and testimony as untimely.

{7}     NPI's first point on appeal challenging Dr. Olden contends that the district court abused its discretion in ruling that their objection was untimely because NPI's objection was to Dr. Olden's qualifications and therefore no pretrial hearing under *Alberico* was required. NPI states in its brief in chief:

> *Alberico* set out the procedure to be followed in determining whether or not the scientific technique or method upon which an expert opinion is based is sufficiently reliable to prove what it purports to prove. In the case at bar, there was no need to request an *Alberico* hearing, because Dr. Olden was not qualified as an expert. Since he is not qualified as an expert, the court need not reach the issue of whether his opinions are based on scientific technique or method.

This is not what NPI argued below. In fact, NPI acknowledged that it missed the district court's deadline to object either to Dr. Olden's qualifications or to his testimony; it did not argue that it was exempt from complying with the district court's pretrial scheduling order in regard to Dr. Olden's qualifications. Therefore, we will not consider this argument on appeal. *See Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 (stating that to "preserve an issue for review

4

on appeal, it must appear that [the] appellant fairly invoked a ruling of the [district] court on the same grounds argued in the appellate court").

{8}	On NPI's second point regarding Dr. Olden's testimony, we understand NPI's contention to be that Dr. Olden's testimony was too speculative and conjectural to establish causation because Dr. Olden lacked a sufficient factual predicate upon which to base an opinion that Kevin's death was caused by any acts or omissions of NPI employees. The basis of NPI's argument is that there was no evidence that Kevin was having an apneic episode the morning he died, nor was there specific evidence as to when Kevin stopped breathing or when his heart stopped. Thus, NPI appears to argue that there was no basis for Dr. Olden's conclusion that Kevin died as the result of an apneic episode and that the NPI staff's failure to make routine checks on Kevin "probably created the circumstances [that] led to his death." More specifically, NPI challenges Dr. Olden's testimony that had NPI staff checked Kevin every fifteen to thirty minutes, there was a better chance that the staff could have intervened to save Kevin's life.

{9}	The admission or exclusion of this testimony was within the district court's discretion. *Zia Trust, Inc. v. Aragon*, 2011-NMCA-076, ¶ 14, 150 N.M. 354, 258 P.3d 1146. "[T]he district court has the duty to make sure that an expert's testimony rests on both a reliable foundation and is relevant to the task at hand so that speculative and

unfounded opinions do not reach the jury." *Id.* (internal quotation marks and citation omitted).

{10}     We conclude that the district court did not abuse its discretion in admitting Dr. Olden's testimony. Dr. Olden testified that his review of the circumstances surrounding Kevin's death included review of the autopsy report by pathologist Dr. Karen Cline-Parhamovich, Kevin's medical records, including Dr. Peter Guido's records, NPI's records related to Kevin, and pathologist Dr. Patricia McFeeley's deposition. These documents and Dr. Olden's extensive medical background in internal medicine provided a sufficient basis for Dr. Olden to testify to a reasonable degree of medical probability that Kevin suffered an apneic episode that contributed to his death. For instance, both Dr. Cline-Parhamovich and Dr. McFeeley testified that the primary physical cause of death was complications of morbid obesity and severe obstructive sleep apnea. It was also undisputed that the last contact Kevin had with NPI staff while alive was an NPI staff member asking Kevin to roll onto his back. Dr. Olden then testified, consistent with Dr. Guido, a sleep specialist who provided testimony regarding the effects of sleep apnea, that people suffering from sleep apnea are more likely to suffer apneic episodes while sleeping on their backs.[1]

---

[1]NPI also questions Dr. Olden's testimony that it was probable that Kevin's tongue blocked his airway. This testimony by Dr. Olden is also supported by Dr. Guido's testimony about how sleeping on one's back could affect someone with obstructive sleep apnea. Dr. Guido testified: "But for most individuals, it would

6

It was therefore a reasonable inference from the facts in evidence that Kevin suffered an apneic episode, and it was within the district court's discretion to admit Dr. Olden's opinion regarding Kevin's cause of death. *Zia Trust*, 2011-NMCA-076, ¶ 19 ("[A]n expert witness may make assumptions based on evidence in the record to reach a conclusion that may be presented to a jury.").

{11}    Furthermore, regarding Dr. Olden's opinion that fifteen- to thirty-minute checks would have increased the likelihood of saving Kevin, it was undisputed by NPI that its staff failed to make any checks in the nearly three-hour window when Kevin's death occurred. Although it is unknown at what exact moment during those three hours Kevin's heart stopped, it was hardly speculative for Dr. Olden to conclude that NPI staff aware of and trained to address Kevin's condition would be better positioned to intervene and thereby increase Kevin's chance of survival by performing more frequent checks suggested by Dr. Olden's testimony. This is especially true where Dr. Olden's opinion that NPI should have performed more frequent monitoring of Kevin was based, in part, on NPI's prior healthcare plans for Kevin recommending fifteen-minute checks while Kevin slept during the day, evidence of NPI staff witnessing

typically be worse if they were sleeping on their back. Just the effects of gravity tends to pull the airway downward, tends to cause the tongue to be, you know, more collapsible towards the back of the throat."

Kevin's prior apneic episodes, including face discoloration due to reduced oxygen intake, and Kevin's noted refusal to wear the CPAP.

{12} Finally, it is immaterial, for the purposes of determining the admissibility of Dr. Olden's testimony, whether NPI's pathologist concluded in contradiction to Dr. Olden that NPI staff would have had to check Kevin within five minutes of his entering respiratory failure in order to resuscitate him. Indeed, this competing testimony highlights the fact that NPI's criticisms of Dr. Olden's testimony went to the weight it should have been afforded by the jury and not to its admissibility. *See Wood v. Citizens Standard Life Ins. Co.*, 1971-NMSC-011, ¶ 19, 82 N.M. 271, 480 P.2d 161 ("Once a medical witness has qualified to give an expert medical opinion upon a particular issue, the weight, if any, to be given [the expert's] opinion on [the] issue, and the resolution of conflicts between [the expert's] opinion and the opinions of other medical experts on the issue, are for the trier of the facts."). Accordingly, because Dr. Olden's opinions were neither speculative nor conjectural, the district court did not abuse its discretion in admitting Dr. Olden's testimony.

{13} Because we conclude that Dr. Olden's testimony was properly admitted, we do not reach NPI's related argument that in the absence of his testimony there was insufficient evidence for the jury to conclude that any acts or omissions of NPI staff were a cause of Kevin's death. Similarly, while we agree with NPI that "Plaintiffs

failed to prove a claim of 'loss of chance,' " it does not impact our decision because Plaintiffs never pursued a theory of loss of chance nor was such a claim submitted for the jury's consideration.

**The New Mexico Department of Health (NMDOH) Exhibits**

{14}     NPI contends that the district court erred in admitting two documents, Exhibits 27 and 33, relating to the NMDOH's investigation into Kevin's death.  Exhibit 27 is the NMDOH investigator's actual report, while Exhibit 33 is the investigator's letter to NPI informing it of the investigator's findings.  The district court admitted these exhibits in accordance with Rule 11-803(H) (2011) NMRA.

{15}     At the time of trial, Rule 11-803(H)(3) (2011) provided that "[r]ecords, reports, statements or data compilations, in any form, of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law" are admissible "unless the source of information or other circumstances indicate lack of trustworthiness."  NPI first argues that the investigator's findings of "neglect" by NPI constitute legal conclusions, not factual findings, and they are therefore outside the scope of Rule 11-803(H).  NPI argues secondly that the findings in the report are untrustworthy because the investigator had no particular expertise in the provision of services to developmentally disabled individuals and the factual findings in Exhibit 27 were not the result of a hearing in

9

the nature of a judicial proceeding. Finally, NPI argues that the reports were not relevant to any fact at issue and were unduly prejudicial. We address these contentions in turn and review the admission of these exhibits for abuse of discretion. *Gonzales v. Surgidev Corp.*, 1995-NMSC-036, ¶ 21, 120 N.M. 133, 899 P.2d 576.

{16} First, admission of the NMDOH report was within the district court's discretion even if NPI correctly characterized the report's factual findings as legal conclusions. *See id.* ¶ 24 ("[P]ortions of investigatory reports otherwise admissible under [Rule 11-803(H)(3) (2011)] are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." (internal quotation marks and citation omitted)). NPI makes no argument that any conclusions in the report were not based on a factual investigation.

{17} Second, NPI failed to meet its burden to show the untrustworthiness of the NMDOH exhibits either on the basis of the investigator's qualifications or because the reports were not the result of a hearing in the nature of a judicial proceeding. *Gonzales*, 1995-NMSC-036, ¶ 25 ("[T]he burden of proving untrustworthiness is on the party opposing admission of the report."). In *Gonzales*, our Supreme Court adopted four factors to aid in determining the trustworthiness of a public record: "(1) the timeliness of the investigation[,] (2) the investigator's skill or experience[,] (3)

whether a hearing was held[, and] (4) possible bias when reports are prepared with a view to possible litigation." *Id.* ¶ 24.

{18}     In this case, the investigator's qualifications do not indicate a lack of trustworthiness. Without delving into the investigator's full qualifications, we note that the investigator testified that he has worked as an investigator for the NMDOH for eleven years and has handled approximately 1200 investigations. He also testified that he has worked in the mental health field for eighteen years and holds certification under the National Certification of Investigative Accreditation. Contrary to NPI's assertions, the investigator's skills and experience indicate a level of requisite trustworthiness in regard to these exhibits.

{19}     Furthermore, the fact that the investigator's report was not the result of a hearing in the nature of a judicial proceeding is not dispositive. In *Gonzales*, our Supreme Court did not indicate that each of these factors must be met in order to show trustworthiness. *See id.* ¶ 25 ("The rule assumes admissibility in the first instance but with ample provision for escape *if sufficient negative factors are present*." (emphasis added) (internal quotation marks and citation omitted)). NPI does not challenge the timeliness of the NMDOH investigation or argue that the investigation was undertaken in view of potential litigation. And because we conclude that the investigator's qualifications weigh in favor of the trustworthiness of the report, the fact that his

conclusions were not the result of a hearing does not tip the scales toward the report's inadmissibility.

**{20}** Finally, we also reject NPI's assertion that Exhibits 27 and 33 were not relevant to a fact in issue and that they were unduly prejudicial. *See* Rules 11-401 and 11-403 NMRA. The report detailed the investigator's findings regarding acts and omissions of NPI staff on the night of Kevin's death and were thus clearly relevant to Plaintiffs' claims. Furthermore, NPI points us to no authority as to why the use of the word "neglect" in an investigator's report should be considered unduly prejudicial. *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (stating that where a party cites no authority to support an argument, we may assume no such authority exists). NPI had the opportunity to cross-examine the investigator on his use of the term "neglect" in his report if NPI feared a confusion of terms in the investigator's report and in the Resident Abuse and Neglect Act. Accordingly, the district court did not abuse its discretion in admitting these exhibits.

**Loss of Consortium**

**{21}** NPI argues that the district court erred in allowing Kevin's parents' claim for loss of consortium to go to the jury. A loss of consortium claimant must demonstrate two elements in order to recover damages: (1) that the claimant and the injured party shared a sufficiently close relationship, and (2) that the tortfeasor owed a duty of care

to the claimant such that it was foreseeable that harm to the injured party would damage the relationship between the injured party and the claimant. *Wachocki v. Bernalillo Cnty. Sheriff's Dep't*, 2011-NMSC-039, ¶ 5, 150 N.M. 650, 265 P.3d 701. NPI does not argue that it was unforeseeable that injury to Kevin would damage the relationship between Kevin and his parents, and therefore we do not consider the second element. NPI argues instead that, as a matter of law, Kevin, as an adult child living outside his parents' home and sharing no financial or caretaking interdependence, cannot be said to share a sufficiently close relationship with his parents to warrant loss of consortium compensation.

{22}    Under the "sufficiently close relationship" prong, our Supreme Court recently emphasized that the degree of "mutual dependence" is the key inquiry but also reiterated the myriad of factors that should inform the determination of a claimant's relationship with the injured party. *Wachocki*, 2011-NMSC-039, ¶¶ 5, 10. These factors include:

> [T]he duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and . . . whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day[-]to[-]day relationship, and the manner in which they related to each other in attending to life's mundane requirements.

*Id.* ¶ 5 (omission in original) (internal quotation marks and citation omitted); *see Lozoya v. Sanchez*, 2003-NMSC-009, ¶ 27, 133 N.M. 579, 66 P.3d 948, *abrogated on other grounds by Heath v. Mariana Apartments*, 2008-NMSC-017, 143 N.M. 657, 180 P.3d 664. We review de novo the question of whether a directed verdict is appropriate. *Sunwest Bank of Clovis N.A. v. Garrett*, 1992-NMSC-002, ¶ 9, 113 N.M. 112, 823 P.2d 912.

**{23}** We are unpersuaded by NPI's argument that demonstrating "mutual dependence" in the context of an adult parent/adult child relationship requires showing "a shared household, financial interdependence and/or caretaking interdependence and a long[]term commitment to continue this interdependence." While these factors are important, NPI's argument emphasizes certain *Lozoya* factors favorable to their position at the expense of utilizing the factors as they were intended: to aid the fact finder in determining whether the relational interest at issue is sufficient to permit recovery of loss of consortium damages. *See Lozoya*, 2003-NMSC-009, ¶ 21 ("It is appropriate that the finder of fact be allowed to determine, with proper guidance from the court, whether a plaintiff had a sufficient enough relational interest with the victim of a tort to recover for loss of consortium."). Contrary to NPI's assertions, we conclude that Kevin's disabilities, including his decreased cognitive and emotional capabilities as well as his significant physical and mental health issues,

14

distinguish this case from an adult parent/adult child relationship where both parent and child possess a greater degree of overall independence. This is especially true where Kevin's economic independence resulted from his entitlement to state assistance and such assistance was used, in part, to provide Kevin with access to facilities that could allegedly provide him the care his condition required but that, consequently, removed him from his parents' home. It would thus be improper to conclude in light of the other evidence put forth by Plaintiffs regarding their relationship with Kevin that because Kevin and his parents did not share a household or economic and caretaking interdependence, his parents did not establish a claim for loss of consortium as a matter of law.

**Punitive Damages**

{24}    NPI contends that it was error for the district court to instruct the jury on Plaintiffs' claim for punitive damages. NPI organizes its arguments on this issue under two headings: (1) that there was no evidence from which the jury could find Plaintiffs were entitled to punitive damages, and (2) that the punitive damages claim violates federal constitutional constraints. Upon examination of NPI's briefing, however, we understand NPI's argument under the first point to be that there was not sufficient evidence of cumulative conduct to establish corporate recklessness and that the district court erred in admitting Plaintiffs' "other acts" evidence to prove NPI's

culpable mental state. Under the second point, NPI appears to argue that if the jury awarded punitive damages based on the "other acts" evidence, which included exhibits of previous NMDOH investigations of NPI, the punitive damages award would be in violation of constitutional constraints.

{25} First, we decline to address NPI's argument that there was insufficient evidence of cumulative conduct to establish corporate recklessness. The jury was instructed on three alternate theories for awarding punitive damages. Because NPI only challenges the cumulative conduct theory and does not argue that there was insufficient evidence under either of the other two theories, we will not reverse the jury's award on this basis.[2] *See Atler v. Murphy Enter., Inc.*, 2005-NMCA-006, ¶ 16, 136 N.M. 701, 104 P.3d 1092 ("When the jury instructions provide two alternative bases for awarding

[2]We note that NPI states in its reply brief that it does "not waive an argument that the punitive damages award was not supported by a managerial or ratification theory." NPI made this statement in response to Plaintiffs' assertion that NPI had waived its argument against the punitive damages award under the managerial or ratification theories by only challenging the insufficiency of the evidence under the cumulative conduct theory. While NPI contends in its reply brief that it did not *waive* this argument, it is clear that NPI did not *make* such an argument. The substance of NPI's contention on this point is its conclusory statement in its reply brief that "[t]here [is] no evidence to support an award of punitive damages under any theory recognized under New Mexico law." This is insufficient to challenge the punitive damages award under the managerial or ratification theories. *See* Rule 12-213(A)(4) NMRA ("A contention that a verdict, judgment, or finding of fact is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence[.]"); *see also Hale v. Basin Motor Co.*, 1990-NMSC-068, ¶ 23, 110 N.M. 314, 795 P.2d 1006 (declining to address the issue raised for the first time in a reply brief).

punitive damages, we will uphold the jury verdict if there is substantial evidence in the record to support either.").

**{26}** As to NPI's argument that the district court erred in admitting "other acts" evidence to prove NPI's culpable mental state, this argument fails because NPI does not specify any basis in our rules of evidence for excluding such evidence. *See ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (stating that the propositions unsupported by citation to authority will not be reviewed on appeal). We may assume, due to NPI's use of "other acts" language, that NPI lodges a challenge to this evidence under Rule 11-404(B) NMRA, or that its later use of the phrase "unduly prejudicial" roots NPI's challenge under Rule 11-403. However, NPI does not provide substantive argument under either of these rules, and it is not this Court's responsibility to fill in these gaps or guess at a party's argument. *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess what [a party's] arguments might be."); *see Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104 ("We will not search the record for facts, arguments, and rulings in order to support generalized arguments.").

**{27}** Finally, NPI argues that the punitive damages award must be set aside because of the potential that it was based on evidence contained in exhibits noting injuries

17

inflicted on non-parties. *See Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 51, 150 N.M. 283, 258 P.3d 1075. NPI argues that "because the [district] court erred in admitting Plaintiffs' proffered 'other acts' evidence, the jury may well have awarded punitive damages based on these alleged 'other acts'—none of which involved Kevin or [P]laintiffs." While noting the hypothetical nature of NPI's assertion, we nonetheless conclude that NPI failed to preserve this argument. "To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the [district] court on the same grounds argued in the appellate court." *Woolwine*, 1987-NMCA-133, ¶ 20. Any speculation that NPI has now on appeal regarding the potential basis of the jury's punitive damages award certainly existed before the case was submitted to the jury. And NPI does not alert us to any point in the record where it raised the issue that the jury might improperly base its award on the allegedly improper "other acts" evidence. In fact, despite the availability of UJI 13-1827A NMRA (entitled "[p]unitive damages; evidence of harm or injury to non-parties to the litigation"), NPI never requested this instruction in its proposed jury instructions. UJI 13-1827A states:

> [Plaintiff] has introduced evidence of [harm to others] [risk of harm to others] as a result of [Defendant's] conduct. You may consider this evidence in determining the nature and enormity of [Defendant's] wrongful conduct toward [Plaintiff]. You may not, however, include in your award of punitive damages any amount that punishes [Defendant] for harm to others not before this court.

This instruction would have remedied any error now asserted by NPI regarding the jury's verdict. Accordingly, NPI failed to preserve this issue by failing to request UJI 13-1827A or otherwise objecting to the punitive damages instruction. *See Andrus v. Gas Co. of N.M.*, 1990-NMCA-049, ¶ 26, 110 N.M. 593, 798 P.2d 194 (stating that to preserve error it is necessary to object or tender a correct jury instruction).

**Attorney Fees and Costs Under UPA**

{28}    The totality of NPI's argument on its last point states, "NPI hereby incorporates by reference its arguments contained at RP 1345-1377, as if fully stated herein." NPI has failed to brief this issue, and we will not consider NPI's argument by reference on appeal. *See* Rule 12-213(A)(4). Because NPI states in its reply brief that it is unaware that this practice is prohibited by our rules of appellate procedure, we briefly take this opportunity to emphasize that this is, in fact, improper briefing procedure. In *State v. Aragon*, this Court summarized the reasons why this is improper:

> The appellate rule concerning briefing does not provide for incorporation of arguments contained in other pleadings. . . . [T]his tactic could be used as a means of avoiding the page limitations placed on briefs by the appellate rules. In sum, to facilitate the opposing party's responses and this [C]ourt's decision-making process, [the case] should be decided on the basis of the issues, argument, and authority contained in one manageable set of briefs, as provided for by the rules.

1990-NMCA-001, ¶ 4, 109 N.M. 632, 788 P.2d 932. Accordingly, we deem this issue abandoned by NPI. *See id.* ¶ 5.

**The District Court Can Consider Plaintiffs' Appellate Attorney Fees and Costs Award On Remand**

**{29}** Plaintiffs argue that because NPI challenged the award of attorney fees and costs for Plaintiffs' UPA claim, Plaintiffs should be awarded their reasonable attorney fees and costs relating to the UPA arguments on appeal. On remand, the district court may consider awarding Plaintiffs appellate attorney fees. *See Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 43, 140 N.M. 478, 143 P.3d 717.

**CONCLUSION**

**{30}** Based on the foregoing reasons, we affirm the judgment of the district court.

**{31}** **IT IS SO ORDERED.**

---

**CYNTHIA A. FRY, Judge**

**WE CONCUR:**

---

**LINDA M. VANZI, Judge**

---

**TIMOTHY L. GARCIA, Judge**