**Certiorari Denied, November 1, 2012, No. 33,842**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-120**

**Filing Date: August 29, 2012**

**Docket No. 29,813**

**WILLIS S. MUNCEY,**

   **Plaintiff-Appellee,**

**v.**

**EYEGLASS WORLD, LLC,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**William F. Lang, District Judge**

Bauman, Dow & León, P.C.
Christopher P. Bauman
Alberto A. León
Brian G. Grayson
Albuquerque, NM

Rose Bryan, P.C.
Rose Bryan
Albuquerque, NM

for Appellee

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Emil J. Kiehne
Albuquerque, NM

Reed Smith LLP
Raymond A. Cardozo
San Francisco, CA

for Appellant

1

**OPINION**

**SUTIN, Judge.**

**{1}** A jury awarded Dr. Willis Muncey compensatory and punitive damages against Eyeglass World, LLC, totaling $2,300,002 for breach of contract and for a tort claim based upon conversion of his patient files. Eyeglass World primarily attacks the verdict on grounds of lack of substantial evidence and excessive punitive damages. Eyeglass World also asserts that the Copyright Act, 17 U.S.C. § 301(a) (1998), preempted the district court from having subject matter jurisdiction. We hold that the district court properly exercised subject matter jurisdiction in this case. We further hold that the evidence and applicable law support the damages awards.

**BACKGROUND**

**{2}** Eyeglass World provides optical products and services at retail stores. In conjunction with its optical business, Eyeglass World leases an adjoining portion of its retail space to a contract optometrist who is available to examine patients on-site and provide prescriptions to patients for eyeglasses or contacts that can be prepared on-site. The optometrist is recognized as an independent contractor; all other personnel are Eyeglass World employees that work in both on-site businesses within the store. Dr. Muncey was an optometrist at one of Eyeglass World's stores.

**{3}** Over a period of several months in 2005, Eyeglass World and Dr. Muncey held negotiations in regard to the termination of their contractual relationship. Disputes followed regarding whether Eyeglass World had agreed to buy out Dr. Muncey's remaining contract or whether it had agreed to purchase his patient files, and also regarding whether the negotiations were successful in reaching a final binding agreement. Dr. Muncey believed that he and Eyeglass World had created a binding agreement for the purchase of Dr. Muncey's practice and his patient files for $300,000. When Eyeglass World never implemented what Dr. Muncey believed was the agreement, Dr. Muncey filed suit for breach of contract. The parties then again entered into negotiations and, effective July 31, 2006, signed three contracts: (1) a Termination Agreement, under which Dr. Muncey agreed to dismiss his pending lawsuit and the parties terminated their previous written contract and any oral agreement; (2) a Professional Services Agreement; and (3) a Lease Agreement that contained a new revenue sharing arrangement and space leased to Dr. Muncey (the lease agreement). The lease agreement also provided that Dr. Muncey was to "maintain full and independent responsibility and control over all files and records relating to [his] patients[.]"

**{4}** Soon afterward, Dr. Muncey asserted that Eyeglass World failed to implement and comply with the terms of the lease agreement. As a result, he refused to dismiss his pending breach of contract lawsuit and emailed Eyeglass World to complain that the lease agreement was void because Eyeglass World never fully implemented it. Eyeglass World responded that the lease agreement was not void, although it had yet to fully implement that agreement.

2

Eyeglass World continued paying Dr. Muncey the per diem payable under his former contract and did not pay Dr. Muncey based on the revenue-sharing provision set out in the lease agreement. The parties' relationship continued to deteriorate and Dr. Muncey informed Eyeglass World that he was terminating their relationship and vacating the premises effective April 20, 2007.

**{5}** An April 17, 2007, letter from Dr. Muncey's attorney to Eyeglass World's attorney stated that, "[a]s a gesture of goodwill, Dr. Muncey will attempt to provide doctor coverage from now through the end of May[] 2007[,] in order to give [Eyeglass] World sufficient time to find his replacement." The letter did not mention patient files. Dr. Muncey explained at trial that when he stopped working at Eyeglass World he left his patient files at Eyeglass World so that replacement optometrists would have access to the files until his coverage duties at Eyeglass World ended on May 30, 2007. Dr. Muncey also stated at trial that the files were voluminous and that he was trying to develop a way to house them and easily access them for his use. Dr. Muncey did not explain any of this to Eyeglass World when he vacated the premises. The files numbered approximately twenty thousand and included an electronically stored patient list consisting of contact and prescription information and purchase history, and a paper file containing the optometrist's examination notes, patient history, and similar information.

**{6}** By June 7, 2007, Eyeglass World had spent several weeks and approximately $6,000 copying the patient files at night. Before copying the files, Eyeglass World consulted with the company's corporate attorney who advised that copying the files would not violate New Mexico law, the lease agreement, or the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Eyeglass World did not inform Dr. Muncey that it was copying the patient files, nor did Eyeglass World seek his authorization to access or copy the files. Eyeglass World concluded its copying of the files on July 10, 2007, and placed the files in a storage room.

**{7}** Dr. Muncey became aware that Eyeglass World was in the process of copying his files sometime in mid-June 2007. Acting on the advice of his attorney, Dr. Muncey did not contact Eyeglass World or demand that they stop copying the files. Dr. Muncey explained that he did not demand that the copying immediately stop, nor did he pick up the files because he "was advised to not go near that[,]" and he left them there at the advice of his attorney. Dr. Muncey also never asked that Eyeglass World return the original files or the copies. At no time was Dr. Muncey denied access to the files or restricted from picking up any files. Except for a portion of the patient files relating to LASIK, Dr. Muncey made no arrangements to retrieve any of the files and made no request that any files be returned to him.

**{8}** In late June 2007, Dr. Muncey sought reinstatement of his breach of contract case on the district court docket in order to determine his rights and damages for Eyeglass World's alleged failure to comply with the lease and termination agreements. During July and August 2007, the parties, through their attorneys, engaged in correspondence regarding the

files, as we set out in detail later in this Opinion. In September 2007, Eyeglass World submitted a complaint to the State Regulation and Licensing Department, Compliance Section, addressed to the Optometry Board, regarding Dr. Muncey's refusal to collect his files after Eyeglass World requested that he get them.

**{9}** The court granted reinstatement of Dr. Muncey's case in August 2007, after which, in December 2007, Dr. Muncey filed a motion for leave to file an amended complaint (1) alleging that Eyeglass World, between June 12 and June 31, 2007, obtained possession of and copied his patient files attempting to assert control over the files and to avoid having to pay Dr. Muncey $300,000 for his files; and (2) adding a claim in conversion. The amended complaint was filed in May 2008.[1]

**{10}** At trial, in June 2009, Dr. Muncey argued two different theories for his claim of conversion. First, he asserted that by copying the patient files without his permission, Eyeglass World acted "in defiance of his right of exclusive control over the files." Second, Dr. Muncey argued that copying the files for use by another doctor constituted an "unauthorized and injurious use of his property." The use was injurious because, in Dr. Muncey's own words, the "records are the value[,]" and as stated by Dr. Muncey's attorney, "once those files were copied and were used by another optometrist, they represent[ed] little or no value to him." Ultimately, the jury awarded Dr. Muncey $2,300,002, consisting of $1 on his breach of contract claim, $300,000 on his conversion claim, and $2,000,001 as punitive damages on the conversion claim. This appeal involves only the compensatory and punitive damages awards relating to the conversion claim.

**DISCUSSION**

**I.     JURISDICTION**

**{11}** State law claims are preempted under § 301 of the Copyright Act if: "(1) the work is within the scope of the 'subject matter of copyright' as specified in 17 U.S.C. § 102 [(1990)], § 103 [(1976)]; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106 [(2002)]." *Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir. 1985). We review de novo whether § 301 of the Copyright Act preempts a conversion under New Mexico state law, which presents a question of law. 17 U.S.C. § 301(a); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 658 (4th Cir. 1993).

**A.     The Scope of the Copyright Act**

---

[1] The record does not reflect any activity between December 2007 and May 2008 other than a request for hearing on the motion to amend, a setting on the motion, and a stipulated order vacating the hearing because the court had granted the motion in November 2007.

**{12}** Eyeglass World argues that the Copyright Act preempts Dr. Muncey's conversion claim because medical records fall within the general subject matter of copyright. We are unpersuaded. Congress provided copyright protection only for "original works of authorship fixed in any tangible medium of expression[.]" 17 U.S.C. § 102(a). As such, "[t]he *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). The Copyright Act identifies the type of original works that merit protection, but it is silent on the topic of confidential medical records or patient charts. *See* 17 U.S.C. § 102(a)(1) to (8). This silence is significant, as is the absence of case law considering patient charts as potentially worthy of copyright protection. In fact, the parties have pointed us to only one case that specifically considers medical records in the context of the Copyright Act. That case, *Shloss v. Sweeney*, described medical records as "non-copyrightable fact works." 515 F. Supp. 2d 1068, 1080 (N.D. Cal. 2007). We agree.

**{13}** "Originality is a constitutional requirement" and means that the work is an "independent creation plus a modicum of creativity[.]" *Feist*, 499 U.S. at 346. Accordingly, "[f]acts, whether alone or as part of a compilation, are not original" because they do not present the requisite level of creativity. *Id.* at 350, 358; *see Regents of the Univ. of Minn. v. Applied Innovations, Inc.*, 685 F. Supp. 698, 707 (D. Minn. 1987) (denying copyright to "forms of expression dictated solely by functional characteristics because such material does not exhibit the minimal level of creativity necessary to warrant copyright protection"), *aff'd*, 876 F.2d 626 (8th Cir. 1989). Originality requires the exercise of some individual judgment. The United States Supreme Court held that local laws mandating the recording or creation of a compilation of facts generally preclude finding any element of originality and creativity. *See Feist*, 499 U.S. at 363 (explaining that the state regulations that required a phonebook publisher to "select to publish the names and telephone numbers of its subscribers" precludes individuality because this selection was dictated by state law, not by the phonebook publisher (internal quotation marks omitted)).

**{14}** We conclude that the patient files are fact works that lack originality and do not fall within the general scope of copyright protection. Dr. Muncey testified that "[t]he patient file has got all kinds of medical information, and it's got [s]ocial [s]ecurity numbers in it. It's got patient history . . . along with all their current prescriptions, past prescriptions, and whatever services have been provided." Another optometrist described his patient files as "charts" and explained that "[t]hey contain . . . the exam recordings and things of that nature, notices to patients about procedures." There is nothing in the record that indicates that any form of expression or creativity was involved in creating the fact-based patient files. Dr. Muncey argues that "[t]he patient charts in this case are a systematic gathering of factual information about the patient provided by the patient[.]" We agree that this is a fact-based compilation of patient information. As in *Feist*, state law requires a physician to keep and maintain patient medical records. *See* 16.10.8.7 NMAC (7/15/01) (amended 9/27/07) ("A medical record must be generated[.]"). Accordingly, we hold that the law does not support Eyeglass World's attempt to preempt Dr. Muncey's conversion claim on the basis that the files fall within the general scope of § 102 of the Copyright Act.

**B. Equivalence to the Federal Copyright Act**

**{15}** Having determined that the patient files do not fall within the general scope of copyright protection, the second element of copyright-preemption analysis requires us to determine whether "the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Ehat*, 780 F.2d at 878. Eyeglass World argues that the elements of Dr. Muncey's conversion claim are equivalent to the elements of copyright infringement because "[t]he right to prevent copying is not a different right than those protected by federal copyright law." In response, Dr. Muncey asserts that his claim is based on his exclusive rights to the physical patient files rather than his rights to the data contained in the files. We determine that the rights to exclusive ownership of tangible property are not equivalent to the rights protected by the Copyright Act.

**{16}** "[W]hen a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur." *Id.* (internal quotation marks and citation omitted). Accordingly, "if a state cause of action requires an extra element, beyond mere copying, . . . then the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim[.]" *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993). Courts have distinguished tangible physical property from intangible property for the purposes of preemption analysis. This distinction holds that there is no extra element beyond copying when the object of a conversion claim is intangible. *Compare Ehat*, 780 F.2d at 878-79 (preempting a claim of reproduction and interference "with an intangible literary or artistic property right" as the equivalent of copyright), *and Daboub v. Gibbons*, 42 F.3d 285, 289-90 (5th Cir. 1995) (preempting a conversion claim when the defendants had allegedly improperly copied a song), *with Asunto v. Shoup*, 132 F. Supp. 2d 445, 452 (E.D. La. 2000) (finding conversion of royalties for recordings qualitatively different from a copyright claim because "the object of the conversion [was] tangible"), *and Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003) ("The elements of conversion of physical property are, therefore, qualitatively different than those of copyright infringement.").

**{17}** Eyeglass World asserts that Dr. Muncey's conversion claim is equivalent to copyright infringement because the claim is based upon copying the intangible data in the patient files and not based upon an alleged deprivation of his right to access or use the files. At trial, Dr. Muncey argued that Eyeglass World used the files "in defiance of his right of exclusive control over [them]" and that such use was "unauthorized and injurious." As discussed in more detail later in this Opinion, the jury was instructed as to these theories of conversion and this Court will address his claims based on the deprivation of his right to use and access the files. Additionally, Dr. Muncey expressly argues in his supplemental answer brief that his claim is based on his exclusive right to access, control, and use the tangible patient files, and not his rights to the intangible data contained in them.

**{18}** Because the object of Dr. Muncey's claim was his exclusive right to access, control,

6

and use of the physical files, the act of copying the files, without more, was not presented to the district court as the basis for Dr. Muncey's conversion claim. To prove this element of his claim, Dr. Muncey necessarily relied on one factor similar to a Copyright Act claim: Eyeglass World's unauthorized reproduction of the files. But preemption analysis "compare[s] the elements of the causes of action, not the facts pled to prove them." *Harolds Stores, Inc. v. Dillard Dep't. Stores, Inc.*, 82 F.3d 1533, 1543 (10th Cir. 1996). We must, therefore, focus our preemption analysis on the elements of Dr. Muncey's conversion claim. These elements are: "[(1)] the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or [(2)] acts constituting an unauthorized and injurious use of another's property [.]" *Nosker v. Trinity Land Co.*, 107 N.M. 333, 337-38, 757 P.2d 803, 807-08 (Ct. App. 1988). These elements deal with access to and use of tangible medical records and are unquestionably separate from the elements required to present a claim of copyright infringement. As such, we conclude that the conversion claim, concerned with dominion or interference with ownership rights in tangible property, is not equivalent to the elements of copyright infringement. Accordingly, the Copyright Act does not preempt Dr. Muncey's conversion claim for tangible property and this Court has jurisdiction over the appeal.

## II.   MERITS

{19}   We have consolidated Eyeglass World's points on appeal related to conversion and damages into two points. First, Eyeglass World asserts that its copying of Dr. Muncey's patient files, without more, did not constitute conversion and, therefore, the verdict and judgment should be reversed. In support of this point, Eyeglass World argues that no substantial evidence exists to establish that the copying proximately caused the files to lose value. Independently and alternatively, Eyeglass World argues that no substantial evidence exists to support the conversion elements of (1) exclusion or defiance, or (2) unauthorized and injurious use. Eyeglass World also argues that, at a minimum, the compensatory damages awarded for conversion should be remitted.

{20}   Second, in seeking to strike or remit the punitive damages award Eyeglass World asserts that insufficient evidence existed to permit punitive damages; that the amount awarded was excessive and violated due process; and that at least $1 million of the award was based on Dr. Muncey's improper injection in closing argument of an unpleaded legal theory on which the jury was not instructed. Eyeglass World also argues that if none of these grounds prevail, this Court should remit the award as the product of passion and prejudice.

{21}   "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). The evidence is viewed in a light most favorable to the prevailing party, disregarding evidence and inferences to the contrary. *Montoya v. Torres*, 113 N.M. 105, 109, 823 P.2d 905, 909 (1991). The appellate court resolves all conflicts in the evidence in favor of the decision below. *Nava v. City of Santa Fe*, 2004-NMSC-039, ¶ 10, 136 N.M.

647, 103 P.3d 571; *Insure N.M., LLC v. McGonigle*, 2000-NMCA-018, ¶ 8, 128 N.M. 611, 995 P.2d 1053. In reviewing a substantial evidence claim, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "Additionally[,] we will not reweigh the evidence nor substitute our judgment for that of the fact finder." *Id.* "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *Atler v. Murphy Enters., Inc.*, 2005-NMCA-006, ¶ 13, 136 N.M. 701, 104 P.3d 1092 (internal quotation marks and citation omitted).

## A.  Conversion and Compensatory Damages

**{22}**  Conversion is "the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Nosker*, 107 N.M. at 337-38, 757 P.2d at 807-08; *see also Case Credit Corp. v. Portales Nat'l Bank*, 1998-NMSC-035, ¶ 13, 126 N.M. 89, 966 P.2d 1172 (Minzner, J., dissenting) (stating that "*Nosker* defined at least three different types of conversion, focusing on conversion by demand and refusal"); *Taylor v. McBee*, 78 N.M. 503, 506, 433 P.2d 88, 91 (Ct. App. 1967) ("Conversion is the wrongful possession of, or the exercise of dominion over, a chattel to the exclusion or in defiance of the owner's right thereto; or an unauthorized and injurious use thereof; or the wrongful detention after demand therefor by the owner."). We note that our Supreme Court has also similarly defined conversion. *See In re Yalkut*, 2008-NMSC-009, ¶ 25, 143 N.M. 387, 176 P.3d 1119 (stating that, similar to a misappropriation of property, "conversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made" (alteration, internal quotation marks, and citation omitted)).

**{23}**  In *Frank Bond & Son, Inc. v. Reserve Minerals Corp.*, 65 N.M. 257, 261, 335 P.2d 858, 861 (1959), our Supreme Court adopted the Restatement's measure of damages for conversion.

> "Where a person is entitled to a judgment for the conversion of a chattel or the destruction of any legally protected interest in land or other thing, the damages include
>
> . . . the exchange value of the subject matter or the plaintiff's interest therein at the time and place of the conversion or destruction, or a different value where that is necessary to give just compensation[.]"

*Id.* (quoting Restatement (First) of Torts § 927 (1939)); *see also Cornell v. Albuquerque Chem. Co.*, 92 N.M 121, 125, 584 P.2d 168, 172 (Ct. App. 1978) (stating that, in *Frank Bond & Son, Inc.*, New Mexico adopted the Restatement measure of damages for conversion of

a chattel), *abrogated on other grounds by Albuquerque Concrete Coring Co. v. Pan Am Servs., Inc.*, 118 N.M. 140, 879 P.2d 772 (1994). In *Valley Chevrolet Co. v. Whitaker*, 76 N.M. 488, 490, 416 P.2d 154, 155 (1966), the Court stated that "[i]n a conversion action, where the property has not been returned to the owner, the measure of damages is the value of the property at the time of conversion with interest." Citing *Valley Chevrolet Co.*, in *Crosby v. Basin Motor Co.*, 83 N.M. 77, 79, 488 P.2d 127, 129 (Ct. App. 1971), this Court followed suit.

**{24}** Because the jury instructions bear on the issues, we turn to the jury instructions and law of the case. Afterward, we discuss substantial evidence and other arguments related to the issues.

**1.      The Conversion Jury Instructions**

**{25}** New Mexico does not have uniform jury instructions specifically on the tort of conversion. The jury was instructed that, to establish a claim of conversion, Dr. Muncey had the burden of proving that:

> [(1)]  . . . Eyeglass World unlawfully exercised dominion and control over the patient files that belonged to [Dr.] Muncey in exclusion or defiance of his rights, or
>
> [(2)]  . . . Eyeglass World's actions in copying the patient files constituted an unauthorized and injurious use of [Dr.] Muncey's property[.]

The court further instructed the jury that "[c]onversion is defined as the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property."

**{26}** We see no indication that Eyeglass World specifically objected to the language in these instructions. Rule 1-051(I) NMRA requires that to preserve an error in jury instructions, "objection must be made to any instruction given, whether in UJI Civil or not; or, in case of a failure to instruct on any point of law, a correct instruction must be tendered, before retirement of the jury." An objection cannot be made in general terms. It is necessary to inform the district court of the specific error so it may have the opportunity to correct the error. *Echols v. N.C. Ribble Co.*, 85 N.M. 240, 246, 511 P.2d 566, 572 (Ct. App. 1973). The court must be sufficiently advised of the specific error raised on appeal. *Atler*, 2005-NMCA-006, ¶ 11.

**{27}** The instructions given to the jury contained only two of the three different types of conversion, namely, the exclusion or defiance type and the unauthorized and injurious use type. The instructions did not contain what Justice Minzner characterized as the "conversion

9

by demand and refusal" type which, according to Justice Minzner, was the type of conversion on which *Nosker* focused. *See Case Credit Corp.*, 1998-NMSC-035, ¶ 13 (Minzner, J., dissenting). One of Eyeglass World's arguments on appeal is that Dr. Muncey's conversion claim failed because Dr. Muncey did not make a demand that Eyeglass World turn the files over. Eyeglass World contends that the demand requirement was essentially an element in the exclusion or defiance type of conversion. Its reasoning is that, under the circumstances in this case, there was no exclusion or defiance without Dr. Muncey's "demand for the return of [the] allegedly converted property when [Eyeglass World] originally came into possession of that property lawfully."

{28} Eyeglass World misreads the instruction given to the jury. No instruction sets out law relating to whether the party charged with conversion originally came into possession of the property lawfully. And Eyeglass World did not request such an instruction. Furthermore, conversion by demand and refusal was not a form of conversion given to the jury. The only types of conversion as to which evidence sufficiency is at issue were the exclusion or defiance type and the unauthorized and injurious use type as set out in the district court's instruction. Since demand and refusal presumably constitute one of these different or separate ways to prove conversion under our case law, that demand is not a prerequisite to establishing exclusion or defiance.

## 2.      Eyeglass World's Tendered Conversion-Related Instruction

{29} Eyeglass World did request an instruction relating to conversion that the court rejected. The instruction stated that there is no exclusion or defiance, or injurious use, "when a party copies the records, with or without authorization, and returns the original records or makes the original records available to the other party that claims entitlement to those records." Printed at the bottom of the page of the proffered instruction was a string citation to four cases with no parenthetical explanation of the cases' content or pertinence.

{30} At trial, Eyeglass World's attorney addressed the court's anticipated conversion instruction and Eyeglass World's requested instruction in the following limited manner: "On the conversion instruction, we do not believe there is sufficient evidence to allow this to go to the jury, on these issues, and we object to . . . not including the instruction that we did that deals with defining what is the exclusion or defiance and the injurious use." In its brief in chief on appeal, Eyeglass World repeats that its requested instruction was for the purpose of explaining the terms "exclusion or defiance" and "injurious use[,]" terms that were not "household concepts[.]"

{31} Eyeglass World goes further, however, and attempts to explain, in this Court, what it failed or chose not to explain in the district court. Thus, only now does Eyeglass World explain why several cases, including those cited in its requested instruction, support a rejection of "the notion that conversion liability attaches upon an unauthorized copying alone, in the absence of affirmative plaintiff efforts to reclaim the files." Eyeglass World broadly argues that "conversion liability cannot attach based on unauthorized file copying

alone, and must instead attach only if the copying is either followed by use or a refusal to return the files." Its argument in this regard is based on a contested factual premise that it lawfully came into possession of the original files, and on an assertion that "the tort of conversion is premised on a property deprivation[,]" and therefore there could be no conversion because the copying was not "a real and substantial property deprivation," but instead was a mere "temporary dispossession[]" of property "that easily could have been nipped in the bud."

**{32}** What we see is a requested instruction that sets out a legal theory of conversion that was inconsistent with and contrary to that which the district court was to give the jury. Specifically, Eyeglass World's requested instruction directed the jury that it could not find or conclude that a conversion occurred by the mere copying of the original files, whether authorized or not, as long as Eyeglass World tendered the original files to Dr. Muncey. Yet counsel did not explain in the district court that, in reality, Eyeglass World's requested instruction was inconsistent with or intended to replace the court's anticipated instruction. Rather, Eyeglass World tendered the instruction in the guise of a simple explanatory instruction intended to "define" certain terms. Thus, it is only later, on appeal, and not at the appointed time for objecting to instructions that Eyeglass World mixes its expressed purpose with its implicit purpose, confirming that the instruction was simply explanatory, while arguing, based on the cases cited on the instruction, a legal theory essentially stating to the jury that the claim of conversion could not be established under the court's instruction.

**{33}** To the extent Eyeglass World is attempting to assert error in refusing its requested instruction, we reject the attempt. Based on the bare-boned objection made at trial to the failure to give the instruction, the court did not err in refusing it. The proffered instruction did not correctly define or explain the terms. Further, Eyeglass World failed to specifically object to the district court's conversion instruction on the ground or theory that the instruction erroneously stated the law; the only objection was that the evidence did not support the court's instruction. And, further, Eyeglass World has not sought reversal on appeal based specifically on any asserted error in refusing the requested instruction. The only ground for reversal that Eyeglass World has argued in regard to the conversion instruction is insufficiency of the evidence.

**{34}** Even were we to look into whether Eyeglass World's requested instruction was a correct statement of law, we would hold that the court did not err in refusing it. The cases Eyeglass World cited to support the instruction do not, in our view, require a conclusion that the conversion instruction that the court ultimately gave to the jury was an incorrect statement of the law. Furthermore, the cases are factually distinguishable and were not decided under the law set out in the district court's conversion instructions in this case.[2]

---

[2] The cases, as Eyeglass World cited them, and in its brief in chief added parentheticals, are the following: *Pearson v. Dodd*, 410 F.2d 701, 703, 706 (D.C. Cir. 1969) (determining that there was no conversion although the plaintiff's documents were copied

**3.      The Measure of Damages Instruction**

**{35}**    The damages instruction stated that if the jury should decide in Dr. Muncey's favor on the conversion claim, it "may award the difference between the fair market value of the converted personal property immediately before the conversion and its fair market value immediately after the conversion."[3]  The jury was also instructed that Dr. Muncey had the burden of proving that the conversion was a proximate cause of his damages.  Finally, the jury was instructed that "[a] party may not recover as damages any cost or loss which he reasonably could have avoided."[4]

**{36}**    For an unexplained reason, the parties and the district court in this case agreed to the before-and-after-market value measure of damages reserved for injury to property instead of the conversion measure of damages set out in New Mexico case law.  We will view the given instruction to intend a measure of damages in conversion in conformity with the New Mexico cases as set out earlier in this Opinion, namely, the value of the property at the time of conversion.  Read in that manner, the question arises whether, as Eyeglass World contends, Dr. Muncey was required to prove an impairment of value from Eyeglass World's actual use of the files apart from the mere act of copying.

**{37}**    Eyeglass World construes the measure of damages instruction to require "proof not merely of the files' value, but of an *impairment* in value."  Eyeglass World asserts that a

---

and copies were given to and published by the press and that conversion could not be established where "intermeddling falls short of the complete or very substantial deprivation of possessory rights in the property"); *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 58-59 (D.D.C. 2001) (determining that there was no conversion where the owner was not "deprived of the beneficial use" of copied documents); *A & G Research, Inc. v. GC Metrics, Inc.*, No. 05870/2007, 2008 WL 2150110, at *26 (N.Y. Sup. Ct. May 21, 2008) (stating that "[a]lthough [the d]efendants copied [the p]laintiff's computer data and uploaded such data on their own computer system, an essential element of conversion is that the owner of the property is excluded from use thereof"); *Alpha Funding Group, Inc. v. Aspen Funding LLC*, No. 19204/07, 2007 WL 3375871, at *7 (N.Y. Sup. Ct. Oct. 29, 2007) (determining that there was no conversion where the plaintiff retained possession of customer information and "could have . . . solicited . . . customers and attempted to retain them"; finding "no unauthorized possession . . . to the exclusion of the rights of [the plaintiff]").

[3] This instruction was presumably taken from UJI 13-1814 NMRA found in Chapter 18, Damages, Part B, Property Damages, Elements of the civil instructions, which reads "In determining property damage, if any, you may award the difference between the fair market value of the damaged personal property immediately before the occurrence and its fair market value immediately after the occurrence."

[4] This instruction was presumably taken from UJI 13-860 NMRA found in Chapter 8, Contract and UCC Sales of the civil instructions, which reads the same.

12

value-at-conversion (copying) measure of damages "makes no sense" in the context of this case, arguing that the measure is "derived from forced sale cases[.]" Thus, it gives no credence to Dr. Muncey's position that the value was lost simply upon copying the files. Eyeglass World argues that "[i]f copying alone permits [Dr. Muncey] to recover the files' full value, then [Eyeglass World] would owe [Dr. Muncey] the files' full value even if [he] had demanded the return of all originals and copies the day after the copying and [Eyeglass World] had complied." We are unpersuaded by this argument.

**{38}** In regard to "use," the jury was instructed that, to prove conversion, Dr. Muncey had only to establish that "Eyeglass World's *actions in copying the patient files* constituted an unauthorized and injurious use of [Dr.] Muncey's property[.]" (Emphasis added.) Thus, for a determination of conversion, the jury was permitted to find that the act of copying alone was an injurious use that constituted a compensable injury. The jury was not required to find that Eyeglass World actually used the files in some manner after copying them in order to determine that a conversion occurred for which damages could be awarded. Eyeglass World did not request an instruction that required Dr. Muncey to prove that only an unauthorized or injurious use beyond or after copying could trigger damages based on conversion. Eyeglass World was duty bound to raise its issue with the conversion-related instructions before the instructions were given to the jury. Therefore, it failed to preserve its argument that measuring damages based on the value of the property at the time of conversion was inapplicable in this case.

**{39}** In regard to use, if the jury's determination of conversion was based on the unauthorized and injurious use type of conversion, it would follow pursuant to New Mexico law that the measure of damages was the value of the files at the time of copying the original files. Once the jury determined, based on substantial evidence, that that value was $300,000, the jury was not required to go further and determine that the value was "impaired" by some use after the original files were copied. In the circumstances of this case and based on how the jury was instructed for damages purposes, the jury could determine the value at conversion, which was the point at which the original files were copied.

### 4. The Law of the Case

**{40}** The instructions that were given to the jury became the law of the case on the conversion claim with respect to both the definition and elements of conversion and the basis for determining damages if conversion were proved. *See Atler*, 2005-NMCA-006, ¶ 13 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (internal quotation marks and citation omitted)); *see also Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, ¶ 33, 142 N.M. 150, 164 P.3d 31 (recognizing that the instructions become the law of the case).

### 5. Sufficiency of Evidence of Proximate Cause and Damages

**{41}** Dr. Muncey points to the evidence surrounding negotiations in regard to Eyeglass

13

World purchasing his files and argues that the jury could reasonably conclude that the value of the files was $300,000. Through Dr. Muncey's testimony there was evidence indicating that, at one point, the parties appear to have settled on a $300,000 price for the patient files as part of the negotiations to buy out Dr. Muncey's contract. Eyeglass World appears to have been willing, in order to "treat this in a way that would be better for [Dr. Muncey]," concerning federal taxes, the transaction would be considered a "purchase of an asset," the patient files. We agree with Dr. Muncey that sufficient evidence was presented to establish that the files had been given a value of $300,000 before the claimed act of conversion occurred in June 2007.

{42}   In response to Eyeglass World's motion for a directed verdict, when the district court asked how the copying of the original files so that replacement doctors could have the copies and use them damaged Dr. Muncey, Dr. Muncey's attorney responded, "[b]ecause if they hadn't copied them and if they wanted them, they would have bought them from [Dr. Muncey], like they offered to at one point." On the issue of value, Dr. Muncey's attorney stated that, as a result of the copying, "those files are being used by an optometrist; they now no longer have any value to Dr. Muncey. . . . Once someone else is using those files, their value is zero." He also stated that "[o]nce [the files] were copied, they were destroyed" and that Eyeglass World knew that upon copying the files, "[it] would be taking the value of those files away from [Dr. Muncey]." Dr. Muncey testified that the value in buying a practice is in the doctor's records and that "[i]f [he] went out to buy a practice and there were no patient files, records, [and] history, [he] wouldn't give [the seller] a nickel for [the practice]." In closing argument to the jury, Dr. Muncey's attorney argued that the evidence showed that "Eyeglass World wanted to prevent Dr. Muncey from leaving Eyeglass World, taking his files, moving across the street, and opening up a competing practice."

{43}   Dr. Muncey limits his conversion claim and resulting damages to the act of making unauthorized copies of the files. Dr. Muncey argues that "the entire value of the patient files resided in [his] exclusive control and ownership of them" at the time the copying occurred. Thus, Dr. Muncey concludes, once Eyeglass World divested him of that exclusive control of the files, "all value [to Dr. Muncey] disappeared[,]" with any value moving to Eyeglass World. Dr. Muncey refers to an obvious intent of Eyeglass World to use the copies, having spent $6000 to copy them, and he indicates that the copying made it easier to attract an optometrist and that the copying afforded Eyeglass World an anticipated competitive and economic advantage in providing "a ready made practice with 20,000 patient files[.]"

{44}   The proximate cause and damages analysis is not a particularly simple one given the conduct of the parties and historical facts and circumstances, which obviously left unanswered questions for the court and the jury in regard to reasons, motives, agenda, purposes, and justifications. The discussions between the parties relating to any possible transfer of files were contained in exchanges of correspondence in July and August 2007 between their attorneys. That correspondence started with a July 25, 2007, letter from Eyeglass World's attorney (Zifrony) to Dr. Muncey's attorney (Bauman) stating:

14

In light of the above and the litigious nature of your client, [Eyeglass World] does not want your client to accuse it of having prevented any necessary follow up care. [Eyeglass World] is therefore putting your client on notice of its expectation that your client will immediately remove all of these patient records from [Eyeglass World's] location. If your client fails to do so within the next seven days, [Eyeglass World] will have no choice but to deliver the patient records to your office at your client's cost ([Eyeglass World] can, in the alternative, deliver the records directly to your client at his cost if you will provide me his current work address).

It resumed with Mr. Bauman's July 27, 2007, response stating that Dr. Muncey was out of town on vacation until August 9, 2007, and further stating that "Dr. Muncey has . . . made arrangements for his current [o]ffice [m]anager . . . to pick up the current [LASIK] files (approximately 20 boxes) on August 2nd" and stated that his office manager would contact the manager at Eyeglass World to coordinate the transfer of those particular files. Following which Mr. Zifrony, on July 30, 2007, wrote that the statement regarding Dr. Muncey's being out of town on vacation was "entirely untrue" and also wrote:

In any event, your client has had more than a reasonable amount of time to resolve this issue given how long the records have been kept at [Eyeglass World].

. . . Your client is the one that made a big deal about the need for retaining possession of these records. At the same time, your client has chosen to leave these records at [Eyeglass World] for some time. Your July 27 letter does not even state with certainty whether your client ever intends on removing them. Either immediately provide me with a specific date on which . . . your client or someone else will pick up the records (which date must take place by Friday of this week) or immediately provide me with an address as to where [Eyeglass World] can send these records at your client's cost. Unless I hear a response from you in this regard by noon tomorrow, [Eyeglass World] will discard all of these records beginning six . . . days from now.

Mr. Bauman then wrote on July 31, 2007, that "Dr. Muncey is making arrangements to remove the patient files and will do so as quickly as possible. Please be advised that any action by Eyeglass World to [discard] these patient files will violate both New Mexico and [f]ederal laws." Mr. Zifrony responded on August 1, 2007, that "It is [Eyeglass World's] understanding that [the office manager] from your client's office will be coming to [Eyeglass World] to pick up certain of your client's files on August 9, 2007. [Eyeglass World] will thereafter send any of your client's remaining files to the New Mexico Board of Optometry." On August 1, someone on Dr. Muncey's behalf picked up only the LASIK-related files, stating: "I acknowledge that I did not retrieve from Eyeglass World's location any patient files that were worked on by or through Dr. Muncey that did not involve patients that

15

received or contemplated receiving medical services from The [LASIK] Vision Institute."

**{45}** This correspondence was followed by a September 10, 2007, complaint submitted by Eyeglass World to the State Regulation and Licensing Department, Compliance Section, stating:

> Dr. Muncey was an independent contractor of Eyeglass World who provided optometric services at Eyeglass World's New Mexico location. Dr. Muncey subsequently leased space from Eyeglass World whereby he continued to provide optometric services as a tenant of Eyeglass World and at the same New Mexico location. Dr. Muncey ultimately terminated his lease a few months ago and has since refused to retrieve from that location the majority of his patient records. Attached are letters to Dr. Muncey's attorney from Eyeglass World's attorney, Matthew Zifrony, Esq., requesting that he retrieve his patient records along with Dr. Muncey's attorney's responses.

A letter to the State Regulation and Licensing Department from Mr. Bauman dated November 29, 2007, recounts the foregoing correspondence between the parties and states that "[n]o further exchanges with respect to patient records took place." This letter also stated that

> Attached . . . is a letter from Dr. Nathanial Roland which describes what appears to have been the wholesale unauthorized copying of patient files by Eyeglass World staff subsequent to Dr. Muncey's departure. Because Dr. Muncey believes that this action by Eyeglass World infringes upon patient rights, he took no further action to retrieve patient files until the matter could be fully investigated and if verified, brought to the attention of the New Mexico District Court.

In a letter dated February 11, 2008, the chief investigator for the New Mexico Board of Optometry stated that the Board decided to dismiss Eyeglass World's complaint on the ground that "there is no cause for disciplinary action." None of the correspondence or documents submitted to the Department discuss specifically whether "files" refers to the original patient files, the copies, or both.

**{46}** From all appearances, at the point Eyeglass World copied the files, it hoped or intended to use the copies for future optometrists. Why else copy the files? The CEO and president of Eyeglass World's holding company until sometime prior to trial, Ben Cook, testified at trial about his prior deposition testimony. The testimony indicated that it was valuable to retain Dr. Muncey's files in order to continue to service the patients, and he also indicated a concern about the possibility that Dr. Muncey could open a store nearby and compete with Eyeglass World. Mr. Zifrony testified that "[w]e made the copies so that we had a set of the patient records available for a replacement optometrist in case Dr. Muncey decided to come and take his originals from Eyeglass World."

16

**{47}** The jury was left with an unforgiving set of circumstances to wonder how to resolve the dispute under the instructions. Obviously, the jury saw Eyeglass World as the culprit. We now, on appeal, are confronted with: (1) the determination by the jury, based on the conversion instructions, that the elements of conversion were met either by exclusion or defiance or by unauthorized and injurious use, or both; (2) the determination by the jury, based on the measure of damages instruction, that the files had a $300,000 value to Dr. Muncey and, implicit in its verdict that Dr. Muncey lost that value immediately after the conversion; and (3) a determination by the jury, under the mitigation instruction, that Dr. Muncey mitigated all he had to or could.

**{48}** Dr. Muncey's case for proximate cause and damages turns on whether damages were necessarily sustained and awardable based solely on copying the original files and on whether damages were measured by the value of the files at the time they were copied. Based on the conduct of each party and given the particular, peculiar circumstances in this fully tried case, the long and short of it is that we are simply not prepared to hold that the evidence to prove proximate cause and damages was insufficient. And we are not prepared to second-guess or override the jury. It is up to the parties to carefully try their cases, to assure that the jury is clearly and carefully instructed, to make critical objections in regard to instructions, and to carry the burden of persuasion through convincing evidence and argument. It is not the duty of an appellate court to sift through the testimony and other evidence and attempt to decide the case based on instructions with which the parties found no material fault. "[W]e will not reweigh the evidence nor substitute our judgment for that of the fact finder." *Atler*, 2005-NMCA-006, ¶ 13 (internal quotation marks and citation omitted). We are to determine whether substantial evidence exists to support the jury's verdict. *Id.*

**{49}** In sum, assuming that the jury's determination that a conversion by copying occurred stands based on substantial evidence, we will not disturb the verdict. And, as we discuss next, under the particular and peculiar circumstances in this case, substantial evidence supported the proximate cause and damages verdict of a $300,000 value of the files at the time Eyeglass World converted the files by copying them.

### 6. Mitigation

**{50}** The dissent concludes that Dr. Muncey failed to mitigate damages as a matter of law and was therefore not entitled to any compensatory damages. We have been unable to reach that conclusion.

**{51}** The dissent does not indicate that Eyeglass World moved for a directed verdict on a mitigation issue. The record reflects that no such motion was made. Eyeglass World did not appeal on the ground that the district court erred in failing to grant any motion for a directed verdict on mitigation of damages.

**{52}** Eyeglass World requested a mitigation jury instruction. The instruction was given

17

to the jury. Eyeglass World did not argue at the time against the issue going to the jury. The parties had every opportunity to argue the mitigation issue to the jury. After the verdict, Eyeglass World did not seek a remittitur in district court based on a rationale of failure to mitigate damages as a matter of law.

{53}    Eyeglass World barely mentioned mitigation in its brief in chief. In its reply brief, Eyeglass World argues that, notwithstanding that the jury was instructed on mitigation and that the parties argued the issue to the jury, this Court has the duty to review the mitigation evidence for sufficiency. Eyeglass World cites no authority to substantiate that duty under the circumstances here. The argument is not persuasive.

{54}    Under the conversion theories submitted to the jury, we do not agree with the view that there was no evidence on which a rational finder of fact could award any compensatory damages in the face of the mitigation of damages instruction. Nor do we agree that the evidence required the jury to arrive at solely one finding, namely, that Dr. Muncey failed to mitigate his damages. Eyeglass World, of course, had the burden to establish its affirmative defense of failure to mitigate. Dr. Muncey had only to defeat the defense by demonstrating that he did all he needed to do under the circumstances he faced. He obviously did so, given the jury's verdict.

**7.      The Issue of Sufficiency of Evidence as to Exclusion
          or Defiance, or as to Unauthorized and Injurious Use**

{55}    As indicated earlier in this Opinion, Eyeglass World argues that the unauthorized and injurious use type of conversion was not established in the evidence because there was no substantial evidence that Eyeglass World used the files after copying them. Hence, there was no substantial evidence of any injurious use. Nor, Eyeglass World contends, can mere copying be an injurious use.

{56}    The facts on which Eyeglass World relies for its lack of substantial evidence argument in regard to exclusion or defiance are that Eyeglass World came into possession of the files lawfully, that Eyeglass World repeatedly asked Dr. Muncey to retrieve the files, and that Dr. Muncey did not collect the files or demand that Eyeglass World turn the files over to him after he learned they were being copied. Eyeglass World argues that it never refused to turn the files over and that, because Eyeglass World came into possession lawfully, in order to establish exclusion or defiance, Dr. Muncey was "required to insist on the return of all files and copies[.]" Instead, Dr. Muncey elected to leave the files with Eyeglass World and to pursue his legal action.

{57}    Eyeglass World emphasizes that conversion is premised on a property deprivation and that a defendant must refuse to comply after a plaintiff clearly asserts his property rights in order to assure that the deprivation is "a real and substantial" one and "not merely temporary dispossessions that easily could have been nipped in the bud." According to Eyeglass World, "a timely demand from [P]laintiff would have quickly and mercifully

18

brought this dispute to an end."

{58}    The verdict was a general verdict.  The jury was permitted under the instructions to find conversion from either unauthorized and injurious use or from exclusion or defiance. Whether Eyeglass World originally had lawful possession of the patient files was not an issue submitted to the jury, and Eyeglass World did not request an instruction in that regard. Under the language of the instructions as given to the jury, based on substantial evidence, the jury could draw reasonable inferences from the record that Eyeglass World acted in defiance of Dr. Muncey's rights in the patient files by its unauthorized copying of the files for an intended future optometry use.  Also under the language of the instructions as given to the jury, based on substantial evidence, the jury could draw reasonable inferences that the copying of the files was both unauthorized and injurious.  We are not prepared to determine that the issue of conversion should not have been given to the jury based on lack of substantial evidence.

B.    Punitive Damages

{59}    Eyeglass World challenges the punitive damages award on grounds that (1) the evidence was insufficient to permit punitive damages, (2) the amount of the award was excessive and violates due process, and (3) Dr. Muncey's closing argument improperly injected an unpleaded legal theory on which the jury was not instructed.  Eyeglass World requests this Court to remit the award as a product of passion and prejudice if we do not strike or remit the award on one of the three grounds.

1.    Sufficiency of the Evidence for Punitive Damages

{60}    Eyeglass World argues that the evidence is insufficient to establish that its actions reached such a heightened culpable mental state as to be malicious or within the purview of the egregiousness contemplated and required for punitive damages. Much of its argument centers on Dr. Muncey's conduct, not on its own.  The argument does not refer to the punitive damages instruction that permitted the jury to assess whether Eyeglass World's conduct was "malicious, willful, reckless, wanton, fraudulent[,] or in bad faith" and that which specifically defined malicious, willful, reckless, and wanton conduct as set out in UJI 13-1827 NMRA. Eyeglass World fails to show why the jury could not reasonably infer such conduct from Eyeglass World's unauthorized copying and intended retention of the copies, together with Eyeglass World's apparent position that it had a right to copy and use the copies, as well as its apparent ambiguous and uncooperative stances in its correspondence, along with its submitting a complaint to the State Regulation and Licensing Department.

{61}    Nor does Eyeglass World set out the substance of the evidence bearing on the proposition argued as required under our rules and case law.  *See* Rule 12-213(A)(3), (4) NMRA; *see also Martinez v. Sw. Landfills, Inc.*, 115 N.M. 181, 186, 848 P.2d 1108, 1113 (Ct. App. 1993) (stating that the appellate court will not consider an insufficiency of evidence argument without presentation of the evidence as a whole or based only on facts

19

which tend to support the argument). There exists a substantial amount of evidence regarding Eyeglass World's conduct that it fails to set out and that we choose not to detail here. Dr. Muncey sets out some of that evidence in his answer brief. We reject Eyeglass World's sufficiency argument. Eyeglass World fails to sufficiently develop the argument. Furthermore, our review of the record indicates that substantial evidence supported the punitive damages instruction.

## 2.    Due Process

**{62}**    We review the constitutional reasonableness of a punitive damage award de novo. *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 36, 140 N.M. 478, 143 P.3d 717; *Aken v. Plains Elec. Generation & Transmission Coop.*, 2002-NMSC-021, ¶ 17, 132 N.M. 401, 49 P.3d 662. "Any doubt in the mind of the appellate court concerning the question of what appropriate damages may be in the abstract, or owing to the coldness of the record, should be resolved in favor of the jury verdict." *Id.* ¶ 19. In undertaking a de novo review, we consider three criteria:

> 1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* ¶ 20 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996)). The reprehensibility of the conduct is, perhaps, the most important guidepost in the analysis. *Aken*, 2002-NMSC-021, ¶ 21. Eyeglass World argues that the punitive damages award unreasonably exceeds due process limits under the guideposts and considerations governing analysis of such awards.

## a.    The First Due Process Guidepost

**{63}**    As to the first guidepost, reprehensibility, Eyeglass World argues that its conduct was not reprehensible because its conduct was purely economic and did not produce personal injury; its conduct did not consist of a pattern or practice of willful misbehavior, but was isolated, was the product of unusual case-specific circumstances, was done after obtaining its attorney's advice that it was lawful to copy the files, and was not supported by evidence of actual harm. Eyeglass World concludes that "if reprehensible at all, the conduct was at the low end of the scale."

**{64}**    The United States Supreme Court has set the structure for analysis of the first due process guidepost.

> The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.

We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (alteration, internal quotation marks, and citations omitted). Our Supreme Court is in step with *State Farm*. *Chavarria*, 2006-NMSC-046, ¶¶ 37-38.

**b.      The Second Due Process Guidepost**

**{65}**      The second due process guidepost focuses primarily on the ratio between punitive and compensatory damages. We quote *State Farm* for the view, to which we adhere, of how to gauge application of the second due process guidepost.

Turning to the second *Gore* guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . [I]n upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. We cited that 4-to-1 ratio again in *Gore*. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the [s]tate's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, or, in this case, of 145 to 1.

*State Farm*, 538 U.S. at 424-25 (internal quotation marks and citations omitted).

21

**{66}**    As to this second guidepost and the ratio analysis, Eyeglass World argues that because the ratio of compensatory damages to punitive damages, which is 6.6 to 1, was greater than a one-to-one ratio, the punitive damages award violated due process because the compensatory damages award was substantial, and "it is difficult to fathom how [Dr. Muncey] suffered any harm[.]"  Eyeglass World also argues that due process warrants a reduction of the award to, at most, a one-to-one ratio given that this is a "purely economic case . . . involving (1) isolated conduct that [Dr. Muncey] was unable to show caused him any harm, and (2) an award of compensatory damages in the full amount he sought[.]"  These circumstances, Eyeglass World argues, are what the United States Supreme Court in *State Farm* "had in mind in noting when a one-to-one ratio is at the 'outermost' limits."  *See State Farm*, 538 U.S. at 425 (stating that circumstances may permit imposition of "a lesser ratio"); *see also Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 798-99 (8th Cir. 2004) (reducing the punitive award to a one-to-one ratio); *Aken*, 2002-NMSC-021, ¶ 22 (reducing the punitive award from $1 million to $300,000).  *State Farm* does not, however, attempt to set any bright-line ratio.  It is obvious that each case must be analyzed based on its particular facts.

> Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages.  The converse is also true, however.  When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.  The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

*State Farm*, 538 U.S. at 425 (internal quotation marks and citations omitted).

**{67}**    Our Supreme Court has explained the difference between the first and second guideposts.  In *Aken*, the Court stated:  "The first guidepost requires comparing damages to the enormity of the defendant's wrong, apart from the injury actually sustained.  The second guidepost represents a different vantage point on the punitive damages award[] and considers the plaintiff's injury."  2002-NMSC-021, ¶ 23; *see Chavarria*, 2006-NMSC-046, ¶¶ 36, 38.  As to the second guidepost, repeated in *Chavarria*, the Court in *Aken* stated the test as, "the amount of an award of punitive damages must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice."  *Aken*, 2002-NMSC-021, ¶ 23 (alteration, internal quotation marks, and citation omitted); *see Chavarria*, 2006-NMSC-046, ¶ 38.  *Chavarria* focused on *State Farm*'s "flexible approach, especially in situations involving egregious behavior, low compensatory damage awards, injuries that are difficult to detect, or non-economic harm that is not easily converted into a dollar value."  *Chavarria*, 2006-NMSC-046, ¶ 38.  According to *State Farm*, "[i]n sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  538 U.S. at 426.

22

### c.    The Third Due Process Guidepost

**{68}**    As to the third guidepost, Eyeglass World argues that few meaningful conversion penalties exist to compare to the award in this case, particularly where "a defendant's bare exercise of dominion over the plaintiff's property, without denying the plaintiff access or injuriously using [the property], is generally not punished or punishable at all." Eyeglass World states that "[d]ue process . . . permits at most a small punitive award."

### d.    Consideration of the Due Process Guideposts

**{69}**    Assessing the first guidepost, reprehensibility, is no particularly easy task when looking at totality of the circumstances present in this case and given the fluidity of the guideline and the balancing required under the *State Farm* structure. In Eyeglass World's favor, the case before us reflects an isolated occurrence in a peculiar set of circumstances with Dr. Muncey likely facing slight, if any, financial vulnerability were he to have acted quickly to retrieve the patient files and obtain the copies and with Dr. Muncey being legally damaged economically only. Further, Eyeglass World's conduct did not evince an indifference to or a reckless disregard for health or safety, although the jury may have considered Dr. Muncey's testimony in regard to his loss of sleep and concern in regard to his license and livelihood with the pending complaint submitted by Eyeglass World to the Optometry Board. Moreover, Dr. Muncey was made whole through the award of compensatory damages. Yet the jury's reaction indicates a view that Eyeglass World's motive was to obtain, keep, copy, and use the files without paying for them. Under this first guidepost, following the *State Farm* analysis, "punitive damages should . . . be awarded if [Eyeglass World's] culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id*. at 419.

**{70}**    Turning to the second guidepost, in which *State Farm* focused on the ratio between punitive and compensatory damages, the ratio we are looking at is a single-digit ratio of 6.6 to 1. *State Farm* refused any bright-line ratio, but indicated that "few awards exceeding a single-digit ratio . . ., to a significant degree, will satisfy due process[,]" while "[s]ingle-digit multipliers are more likely to comport with due process[.]" *Id*. at 425. Looking solely at ratio, it is apparent that the 6.6 to 1 ratio has the potential of comporting with due process. Yet, according to a rule established by our Supreme Court in *Aken*, it must still pass another fluid analysis—it must be apparent that the amount of the award is not "so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice." 2002-NMSC-021, ¶ 23 (internal quotation marks and citation omitted). Here, the issue is not so much the ratio, but whether the $2 million punitive damages award plainly manifests passion and prejudice.

**{71}**    Moving to the third guidepost, the disparity between the punitive damages award and the civil penalties assessed in analogous cases, *see State Farm*, 538 U.S. at 428, Dr. Muncey looks for comparison to civil penalties under HIPAA and to criminal larceny, theft, and

embezzlement statutes. We see no basis for comparison. HIPAA violations were ruled in this case to be irrelevant, and no criminal violations were shown to apply to the facts.

**{72}** A review of somewhat factually applicable New Mexico cases that evaluate the guidepost factors in a due process analysis does not particularly assist us in evaluating the due process question in the case now before us. *See Chavarria*, 2006-NMSC-046, ¶¶ 35-39 (engaging in a detailed review of the guideposts, and remanding the matter for re-assessment by the district court of its reduction of its initial punitive damages award of $250,000 down to $150,000, in a case involving fraud and conversion); *Aken*, 2002-NMSC-021, ¶¶ 19-28 (engaging in a detailed review of the guideposts, and affirming the district court with an adjustment of the punitive damages award on a defamation claim from $1 million down to $300,000); *Bogle v. Summit Inv. Co., LLC.*, 2005-NMCA-024, ¶¶ 34-37, 137 N.M. 80, 107 P.3d 520 (engaging in analysis of the guideposts and determining that all three guideposts supported the modest punitive damages award). We do not include *Jolley v. Energen Res. Corp.*, 2008-NMCA-164, 145 N.M. 350, 198 P.3d 376, in our review, because it involves serious bodily harm.

**{73}** Weighing the guidepost factors as we must with their built-in imprecision and indeterminateness, while a close case on the issue, we are unable to conclude that the punitive damages award was excessive or was the result of passion and prejudice. We therefore hold that the award did not violate due process.

### 3. Other Considerations

**{74}** Eyeglass World also asks this Court to "sharply reduce" the punitive damages award because the award wrongfully punishes the equity owner of Eyeglass World, National Vision, because National Vision purchased its equity interest after the conversion took place, and therefore did nothing wrong, and because the $29 million purchase price paid to acquire the equity interest was allowed in evidence over Eyeglass World's objection. Eyeglass World argues that forcing National Vision to pay the award does not accomplish "the limited purpose of punitive damages [of] punishing a wrongdoer and deterring future tortious conduct." *McNeill v. Rice Eng'g & Operating, Inc.*, 2003-NMCA-078, ¶ 32, 133 N.M. 804, 70 P.3d 794 (alteration, internal quotation marks, and citation omitted).

**{75}** Eyeglass World raises this issue for the first time on appeal. We will not, therefore, consider it. *See Reule Sun Corp. v. Valles*, 2010-NMSC-004, ¶ 9, 147 N.M. 512, 226 P.3d 611. Furthermore, Eyeglass World provides no authority on the particular issue of reducing punitive damages awarded against a wrongdoer out of concern for the wrongdoer's successor in interest's purported innocence. And, in addition, Eyeglass World does not support this claim of innocence with facts showing that National Vision's purchase occurred before Eyeglass World had any notice of possible lawsuit by Dr. Muncey for conversion.

### C. Claimed Closing Argument Impropriety

24

**{76}** In closing argument, Dr. Muncey asked the jury to award $2 million in punitive damages, consisting of $1 million for Eyeglass World's conduct leading up to and involving copying the files, and another $1 million based on Eyeglass World's having filed a complaint with the Optometry Board for a wrongful purpose. Eyeglass World complains that Dr. Muncey did not plead a claim or seek an instruction based on Eyeglass World's complaint to the Optometry Board. It complains that it had no warning that the argument would be made to the jury. It asserts that it was prejudiced by the "bolt-from-the-blue" and was deprived of any opportunity to defend itself by showing that it had made the complaint in good faith and without malice or to seek jury instructions explaining that the complaint was privileged under New Mexico's Uniform Licensing Act, NMSA 1978, §§ 61-1-1 to -33 (1957, as amended through 2012). Eyeglass World also attacks the propriety of the argument on the ground that the complaint had nothing to do with acts purportedly constituting conversion.

**{77}** Eyeglass World failed, however, to object to the argument until post-trial motions. *See Allen v. Tong*, 2003-NMCA-056, ¶ 37, 133 N.M. 594, 66 P.3d 963 (stating that, where the plaintiff made no objection to defendant's counsel's closing argument, we "will review the propriety of the statement only in exceptional cases where the interest of substantial justice is at stake" (internal quotation marks and citation omitted)); *Lopez v. Sw. Cmty. Health Servs.*, 114 N.M. 2, 8, 833 P.2d 1183, 1189 (Ct. App. 1992) (stating that, as a general rule, failure to object to closing argument precludes appellate review). Eyeglass World acknowledges that it is relegated to a request that we apply a theory of "non-waivable 'fundamental error'" to grant a new trial. For this theory, Eyeglass World relies on *Gracia v. Bittner*, that notes, in relation to a failure to alert the district court to a statutory amendment, only that "the common element in civil cases that have been reversed for unpreserved error has been the total absence of anything in the record of the case showing a right to relief in the person granted relief." 120 N.M. 191, 196-97, 900 P.2d 351, 356-57 (Ct. App. 1995). Eyeglass World also relies on *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, 146 N.M. 853, 215 P.3d 791, that requires, for application of the rule permitting reversal for improper closing argument, the rule "only be applied as a last resort and is not to be applied unless we are satisfied that the argument presented to the jury was so flagrant and glaring in fault and wrongdoing as to leave the bounds of ethical conduct, such as going outside the record." *Id.* ¶ 57 (internal quotation marks and citation omitted).

**{78}** We are unpersuaded. The closing argument statement Eyeglass World attacks does not come within the purview of *Allen*, *Gracia*, or *Sandoval*. The subject matter of the argument was well within the record. The complaint to the Optometry Board was an extension of the correspondence regarding the transfer of the files and could be seen as having been inspired with a less than beneficial motive. The complaint was listed in the parties' exhibit lists and was discussed at different times during trial. We do not see the $1 million statement as an "exceptional case[] where the interest of substantial justice is at stake[,]" *Allen*, 2003-NMCA-056, ¶ 37 (internal quotation marks and citation omitted), nor

do we see the case as involving circumstances coming within the requirements set out in *Sandoval*. *Sandoval*, 2009-NMCA-095, ¶ 57.

**CONCLUSION**

**{79}**    We affirm.

**{80}    IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**I CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**TIMOTHY L. GARCIA, Judge (dissenting).**

**GARCIA, Judge (dissenting).**

**{81}**    I respectfully dissent in this case. Although the circumstances in this case are unique, the fact remains Dr. Muncey failed to mitigate his damages regarding his conversion claim asserted in his amended complaint. As a result, Eyeglass World was entitled to a partial directed verdict at the end of Dr. Muncey's case in chief.

**{82}**    Even viewing the facts in the light most favorable to Dr. Muncey, it was undisputed that, based on the advice of his attorney, Dr. Muncey failed to undertake any action to mitigate his damages for the conversion of his files. Majority Opinion ¶ 7. The timing of Dr. Muncey's knowledge that his files were being copied and therefore converted by Eyeglass World is critical to the directed verdict analysis in this dissent.

**{83}**    It is undisputed that Dr. Muncey knew that Eyeglass World was copying his files for several weeks *before* Eyeglass World completed the copying process. As the majority has pointed out, Dr. Muncy became aware that the files were being copied in mid-June 2007 and the copying process was not finished until July 10, 2007. Majority Opinion ¶¶ 6-7. As a result, Dr. Muncey's duty to mitigate his damages arose in mid-June and lasted for several weeks, even though he chose to disregard this legal obligation based upon the advice of his attorney.

**{84}**    I shall address below whether the advice of an attorney provides a legal justification to avoid one's duty to mitigate damages. I conclude that it does not. As a result, Dr. Muncey failed to present substantial evidence to establish the damages element of his conversion claim. Eyeglass World was entitled to a directed verdict prior to any jury deliberations on Dr. Muncey's conversion claim.

26

**{85}**     It is undisputed that Dr. Muncey had the affirmative duty to mitigate his damages before he was entitled to recover under his claim of conversion. The jury was given UJI 13-860, the instruction on Eyeglass World's mitigation of damages affirmative defense. Eyeglass World specifically requested this instruction. The instruction states: "[a] party may not recover as damages any cost or loss which he reasonably could have avoided." UJI 13-860. As a result, the instruction became the law of the case and Dr. Muncey cannot now argue that mitigation of damages was inapplicable or improper with regard to his conversion claim. *See Sandoval*, 2009-NMCA-095, ¶ 43, ("The sufficiency of the evidence is measured against the jury instructions, because they become the law of the case."); *see also Atler*, 2005-NMCA-006, ¶ 13, ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (internal quotation marks and citation omitted)).

**{86}**     Dr. Muncey argued that the initial act of copying the files constituted damages for an actionable conversion claim, irrespective of any subsequent use or defiance of his right of exclusive control. As such, Dr. Muncey asserted that the value of the files was destroyed the instant Eyeglass World copied them and, as a result, he was under no duty or obligation to mitigate his damages. Yet Dr. Muncey was aware that his files were being copied to his detriment several weeks before all of the files were copied and much of their corresponding value was actually destroyed. Majority Opinion ¶¶ 6-7. Dr. Muncey's only explanation for this failure to act and avoid these continuing damages was that "I was advised not to go near that" and "I left them there at the advice of my attorney." He also argued that "he had already taken action . . . by filing the lawsuit," that "he wanted to proceed with caution, investigate and confirm the rumor," and that "[his] failure to take immediate action [does not] justify Eyeglass World's copying of those files without his permission[.]"

**{87}**     In his brief to this Court, Dr. Muncey failed to even address the issue of his failure to act and mitigate any damages caused by the copying of the files. In addition, Dr. Muncey failed to provide any authority that would support his "advice of my attorney" justification that was offered at trial to establish the legal basis for his failure to take any action to mitigate his damages. *See Pickett Ranch, LLC v. Curry*, 2006-NMCA-082, ¶ 45, 140 N.M. 49, 139 P.3d 209 (stating that where no supporting authority for a proposition is cited, this Court may assume that no applicable or analogous authority exists); *see also In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (noting that where a party cites no authority to support an argument, we may assume no such authority exists).

**{88}**     Independently, I was unable to discover any authority that would support Dr. Muncey's position that a party can disregard its legal duties and obligations based upon the advice of its attorney. If such a justification were recognized, then any injured party could avoid its legal duty to mitigate damages by simply obtaining advice from an attorney that it should take no action. Dr. Muncey has also failed to provide us with any public policy that would support an advice of counsel exception as the recognized basis for avoiding one's legal duty to mitigate damages. *Id.* As a result, Dr. Muncey failed as a matter of law to mitigate the conversion damages he claimed to have suffered from the copying of his files

27

between mid-June 2007 and July 10, 2007. Because the burden to prove damages rested upon Dr. Muncey, there was insufficient evidence to prove the $300,000 in damages awarded for the conversion of his files. No other evidence was presented to establish a value of the limited portion of the files that were copied prior to mid-June 2007. The only evidence presented at trial to establish the $300,000 value for Dr. Muncey's files was based upon the parties' prior contractual negotiations to purchase *all* of these files for that amount. Without the required evidence, Dr. Muncey failed to meet his burden of proof, and the jury was improperly asked to speculate about his damages for the conversion of a limited portion of his files. *See McGinnis v. Honeywell, Inc.*, 110 N.M. 1, 7, 791 P.2d 452, 458 (1990) (recognizing that where actual damages and mitigation of damages are concerned, a jury must not be asked to speculate on matters that should have been presented in the form of evidence).

**{89}** In conclusion, I do not concur with the result reached by the majority in this case regarding Dr. Muncey's conversion claim and the jury verdict rendered in his favor. The district court erred when it denied Eyeglass World's motion for a directed verdict regarding Dr. Muncey's conversion claim.

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for *Muncey v. Eyeglass World, LLC*, No. 29,813**

**APPEAL AND ERROR**
Fundamental Error
Substantial or Sufficient Evidence

**ATTORNEYS**
Comments by Attorneys at Trial

**CIVIL PROCEDURE**
Directed Verdict

**CONSTITUTIONAL LAW**
Due Process

**CONTRACT**
Breach

**FEDERAL LAW**
Federal Jurisdiction
Patents and Copyright

**GOVERNMENT**

Licensing

**JURISDICTION**
Federal Jurisdiction
Subject Matter
**JURY INSTRUCTIONS**
Civil Jury Instructions

**PROPERTY**
Conversion
Leases and Leaseholds

**REMEDIES**
Compensatory Damages
Excessive Damages
Measure of Damages
Mitigation of Damages
Punitive Damages

**TORTS**
Conversion
Proximate Cause